132 So.2d 522 (1961)
Robert LAMBERT, Plaintiff and Appellant,
v.
WOLF'S, INC. et al., Defendants and Appellees.
No. 256.
Court of Appeal of Louisiana, Third Circuit.
July 12, 1961.
Rehearing Denied September 7, 1961.
Certiorari Denied November 6, 1961.
Piccione & Piccione, by Peter C. Piccione, Lafayette, for plaintiff-appellant.
Davidson, Meaux, Onebane & Donohoe, by Richard C. Meaux, Lafayette, for defendants-appellees.
Before TATE, HOOD and CULPEPPER, JJ.
HOOD, Judge.
This is a workmen's compensation suit instituted by Robert Lambert against his employer, Wolf's Inc., and its compensation insurer, in which plaintiff alleges that he is totally and permanently disabled as the result of an accident which occurred on February 12, 1959. After trial of the case on its merits judgment was rendered by the trial court rejecting plaintiff's demands, and plaintiff has appealed from that judgment.
Plaintiff concedes that he has received all of the compensation benefits due him from the date of the accident until March 11, 1959, and all parties agree that the sole question presented on this appeal is whether plaintiff has had any disability attributable to the accident from and after the last mentioned date.
The evidence shows that on February 12, 1959, while plaintiff was engaged in loading 100-pound sacks of dry milk into a truck, he fell between the truck and the loading dock. As a result of this accident he sustained a twisting injury to his back and abrasions on his right leg. In the petition it is alleged "that plaintiff's injuries *523 and disabilities have been diagnosed as `lumbo-sacral strain' and `post traumatic neurosis,'" etc.
Immediately following the accident, plaintiff was sent to Dr. J. J. Fournet, a general practitioner, who treated him from that date until February 27, 1959, or a period of about fifteen days. On the initial examination Dr. Fournet diagnosed plaintiff's injury as a lumbosacral strain and abrasions of the right leg. He testified that at that time plaintiff's back "was slightly sore," that "he had very little back complaint," and that "in retrospect I think if it was a lumbosacral strain, it was a very mild one; in other words, I was not at any time impressed with his back." On a subsequent examination, made on February 16, or four days after the accident occurred, Dr. Fournet found no muscle spasm, and the examination otherwise was completely negative as to any back injury or disability. Plaintiff continued to complain of pain, however, so on February 27, Dr. Fournet referred plaintiff to Dr. William Meuleman, an orthopedic surgeon, for examination and evaluation. He explained his reasons for referring plaintiff to an orthopedic surgeon as follows:
"The reason I referred him was the reason he was complaining and I couldn't find anything to account for his complaints. In other words, Robert maintained that his back bothered him. He stated that he was unable, he felt that he was unable to do anything. He complained of that bitterly and I could find no objective findings to account for it and I felt personally, of course, it was giving an opinion, but I thought he was putting on most of his complaints. I wasn't at all impressed with his complaints."
Plaintiff did not keep his appointment with Dr. Meuleman and did not return to Dr. Fournet for any further examinations or treatment. Dr. Fournet testified that in his opinion, plaintiff had fully recovered by February 27, 1959, and that on that date he was able to return to his regular work.
Plaintiff consulted his brother's family physician, Dr. Phillip Purpera, a general practitioner, on March 5, 1959. Dr. Purpera examined plaintiff on that date and treated him continuously thereafter until June, 1960, when plaintiff discontinued coming to him. On the initial examination Dr. Purpera found muscle spasm in the lumbar region, and he concluded that plaintiff had a lumbosacral strain. Between March 5 and October 20, 1959, he found muscle spasm in the lumbar region on some of the examinations and failed to find it on others, but he testified that no muscle spasm has been found since the last mentioned date. He stated that on May 6, 1960, he measured plaintiff's legs for the first time and found about one inch atrophy in the left leg, which he attributed to non-use of that leg due to the back injury. Since October, 1959, Dr. Purpera states that plaintiff has had symptoms of depression, headaches and impotency, which he feels are indicative of a traumatic neurosis resulting from the injury of February 12, 1959, and are disabling. As we understand Dr. Purpera's testimony, he feels that plaintiff was disabled from the date of the accident until some time in October, 1959, because of a lumbosacral strain, and that since the last mentioned date he has been disabled because of a traumatic neurosis and a weakness of the left leg. In his opinion plaintiff has been disabled from performing heavy manual labor continuously since the date of the accident, and that this disability resulted from and is attributable to the accident.
During the time Dr. Purpera was treating plaintiff, he referred plaintiff to several other doctors, who specialized in particular fields of medicine, for examination, evaluation and treatment. Included among these specialists were Dr. James Gilly, Dr. Nick J. Accardo, Dr. William L. Zink and Dr. William L. Kirkpatrick.
Dr. Gilly, an orthopedic surgeon, examined plaintiff initially on March 31, 1959, at *524 Dr. Purpera's request. He found no muscle spasm, no atrophy of either leg (although he noted that plaintiff favored his right leg instead of the left), and the examination in all other respects was negative as to injury or disability. He concluded, and so advised Dr. Purpera, that plaintiff had fully recovered from any injury which he may have had and could return to work.
Dr. Gilly examined plaintiff again on June 9, 1960, at the request of counsel for defendants, and at that time the clinical and X-ray examinations were completely negative as to any injury or disability, as they were the first time Dr. Gilly saw him. No muscle spasm and no atrophy were found, although Dr. Gilly was particularly careful to examine for atrophy, since he had been advised that another doctor had found it to exist. He testified that he was positive there was no atrophy of either leg. He concluded that "there was no residual disability as a result of an injury in this examination," and that plaintiff "was capable of performing his usual and customary work."
Dr. Gilly examined plaintiff a third time on September 7, 1960, after the trial had started, and his findings and conclusions at that time were essentially the same as they had been on previous examinations. He testified that he "could find no residual orthopedic disability."
Dr. Accardo, an orthopedic surgeon of New Orleans, examined plaintiff on May 20, 1959, upon the recommendation of Dr. Purpera and at the request of plaintiff's counsel. The physical, neurological and X-ray examination which he made were negative as to injury or disability, and Dr. Accardo reported his conclusions to plaintiff's attorney, as follows:

"Opinion: It is my opinion that whatever injuries this patient originally suffered on February 12, 1959, that no longer does any original disability exist. It is my opinion that this patient has no orthopedic diagnosis at this time.
"As I believe the above, I have no recommendations to make as far as treatment is concerned. It is my opinion, from an orthopedic standpoint, this patient could return to his former occupation with no residual disability."
Dr. William L. Zink, a surgeon, examined plaintiff on June 13, 1960, at the request of Dr. Purpera, and he treated plaintiff from that date until September 6, 1960. The record shows that he saw plaintiff a total of six times. On the first examination Dr. Zink found atrophy in plaintiff's left thigh, ranging from a little more than one-quarter to about three-quarters of an inch in measurement, although the calf of the left leg was larger than that of the right while plaintiff was in a standing position. He stated that a large varicose vein in the left calf region, with the usual swelling which accompanies it, could account for this difference in calf measurements. The difference in leg measurements, he feels, indicates that plaintiff has favored his left leg, or has used it less that he has the right. He also found some spasm of the lumbar muscles on the left, and a slight irregularity of the eleventh and twelfth ribs on the left, although he stated that "a rib fracture is not identified." He concluded from this examination that plaintiff "sustain a strain to his back musculature and that this may have been of sufficient magnitude to have fractured his eleventh and twelfth ribs on the left, thus accounting for the irregularity of the cortex of the eleventh and twelfth ribs now apparent on X-rays on the left as compared with the right side."
Dr. Zink concluded that plaintiff was disabled, but it appears to us that that conclusion was based on the assumption that the atrophy which he found in plaintiff's left leg was due to the accident, and that plaintiff's subjective complaints of pain in his back were genuine. In our opinion the *525 following excerpts from Dr. Zink's testimony are significant:
"Well, on the examination as to disability estimate, I never gave any estimate on his disability. I don't know how much percent wise disability would be considered as having as a result of his leg being smaller on one side and the soreness in his back.

* * * * * *
"Well, I considered his complaints genuine so I thought he was disabled when I saw him, but I really didn't go into the disability evaluation very deeply.

* * * * * *
"A. I feel like his disability as far as I could determine was his complaint of his pain in his back and this area which is not an objective thing, and I feel that the disability is due to the weakness of his leg which is objective by measurement.
"Q. In other words, the only evidence of disability was this atrophy that you found on the thigh? A. Which I feel is a result of his back injury.
"Q. Of his back injury? A. Yes.
"Q. And what back injury is that? A. When he had the strain and broke his ribs."
We feel that Dr. Zink was in error in assuming that the muscle strain which plaintiff sustained on February 12, 1960, was sufficient to fracture two of his ribs. The evidence shows that plaintiff did not complain of pain in the area of the ribs at any time within at least one year following the accident, and Dr. Zink concedes that if plaintiff made no such complaints during physical examinations made by several doctors in February, March and May, 1959, then "the condition did not exist." Also, it seems to us that Dr. Zink is not justified in assuming that the atrophy which he found in plaintiff's left leg was attributable to the accident, because plaintiff himself testified that it was his right leg which he favored. Dr. Kirkpatrick, whose testimony will be discussed later, reported that plaintiff complained of weakness of the right leg in November, 1959. On March 31, 1959, plaintiff complained to Dr. Gilly of pain "in the right groin radiating toward the right knee." And, Dr. Accardo reported that plaintiff was "favoring neither of the lower limbs" on May 20, 1959. Also, Dr. Zink states that the varicose vein which he found in the calf of plaintiff's left leg, and which is not attributable to the accident, could have caused plaintiff to favor that leg and thus bring about the atrophy in plaintiff's left thigh.
Plaintiff also was admitted to the Veterans Administration Hospital in Alexandria, Louisiana, where he was treated from July 8 to July 28, 1959. The hospital reports, which were admitted in evidence by stipulation, reveal that no muscle spasm in the lumbar region and no atrophy of either leg were found. His condition was diagnosed as "myalgia (subjective symptoms only) lumbar muscles." Dr. Gilly explains that this diagnosis means simply that the patient complains of pain in the muscles but nothing objective could be found to support those complaints. While in the hospital plaintiff was treated by rest on a fracture board, muscle relaxants and physical therapy. The hospital reports then show that: "The above recommended treatment was continued and the pains in the back soon subsided. As no further hospitalization indicated patient is to be discharged and may resume his usual activities. Patient is discharged."
Dr. William L. Kirkpatrick, a neuropsychiatrist, examined plaintiff on November 2 and again on November 9, 1959, at the request of Dr. Purpera. As a result of these examinations he found that plaintiff "was definitely disabled by virtue of his psychiatric condition to do any heavy work at that time." Plaintiff was referred back to Dr. Kirkpatrick on May 31, 1960, and he has been treated by that doctor for tension, *526 nervousness and depression since that time. Dr. Kirkpatrick testified that in his opinion plaintiff has a post traumatic neurosis which is attributable to the accident of February 12, 1959, and which disables him from performing the type of work he had been performing before the accident. His testimony, in part, is as follows:
"I felt, as my letter shows, that this man did have a definite post traumatic neurosis. It appears * * * I feel definitely, according to the evidence that I have in my records, that apparently it was precipitated by his injury and the circumstances following it. He had several disappointments after this. He did not receive any compensation except for one week following this, and this resulted in his worrying about income. The doctors that he went to see didn't seem to find anything definitely bad with him, which worried him even further. He attempted to get on Welfare to help his family and the Welfare turned him down because of State regulations, that he was a compensation case. He also went back and attempted to go back to work and was refused the opportunity to at least give it a try, and later on his wife had to go to work to help support the family, which more or less relegated him to the household, and I think all of these factors combined helped to prolong and intensity this neurosis that I feel he has."
Dr. Kirkpatrick's diagnosis was based upon the claimant's history and upon his observation of what he denoted as "definite objective findings that you can see in any neurosis, such as anxiety in all of its forms, such as extreme tremulous shaking, excessive sweating, extreme restlessness, very anxious appearance to the face, a lack of ability to comprehend, and usually an anxious person has impairment of memory capacity. We can pick up some definite objective signs, which when we tie them all together gives a positive diagnosis * * *." He further testified as follows:
"Q. What anxiety did he express or did he demonstrate when you saw him and treated him? A. Well, he seemed to have the appearance of a person who is afraid, anxiety actually in a neurotic is fear, but it is fear with nothing external to be afraid of, so apparently the fear comes from inside; he appeared afraid. He was restless; he was nervous and obviously tense. He complained of headaches with tightness over the back of the neck, which is a common symptom of a tense headache that occur in neurotics. The neck muscles tighten up in tension to almost as hard as a board and very painful sometimes with those headaches. I think that is the main aspects of it.
"Q. You found these signs of anxiety in Robert Lambert in your examinations? A. I found them in some of my examinations. They weren't present in all."
The evidence shows that plaintiff worked on Saturdays at a service station from about the last week in August, 1959, until the latter part of April, 1960. His duties in that job were primarily to wash cars, but he also serviced cars with gasoline, wiped windshields, swept floors of automobiles and repaired tires occasionally. After leaving his service station job, plaintiff obtained work picking up trash, and he was still doing that type of work at the time of the trial. He testified, however, that he works only two days a week, about an hour and a half each day, at that job, and that his back pains him while he performs those duties. Plaintiff further testified that he could not stoop down at all and that he could not bend his body forward very much at the waist. He, in fact, demonstrated to the court that he could bend forward only until the tips of his fingers reached a point about three inches above his knees, and he testified that he could bend no further. Later, during the trial, plaintiff stated that he could bend a little farther down by extending one of his feet forward, and he then demonstrated that regardless of the *527 position which he assumed he could not under any circumstances bend down farther than to barely permit his hand to touch his knee.
Defendants produced some moving pictures, taken by private investigators employed by defendants, showing some of the work performed by plaintiff on four different Saturdays in April, 1960, at the service station where he worked. Plaintiff, of course, was not aware of the fact that these pictures were being taken. These pictures, together with the testimony of the two private investigators who were present when they were taken and that of the owner of the service station, establish that plaintiff at that time could bend his body to a much greater extent than he testified and that he could lift heavy objects with apparent ease, including 140-pound sacks of terrazzo chips and a 70-pound wheel and tire. In these moving pictures plaintiff unwittingly demonstrated that he could bend his body forward with his legs kept straight until his hands touched the ground, and that he could lift substantial weights while in that bending position.
We are mindful of the fact that evidence in the form of moving pictures must be used with great caution, because such pictures show only very brief intervals of the activities of the subject, they do not show rest periods, they do not reflect whether the subject is suffering pain, and they do not show the after effects of his activities. Gagliano v. Boh Bros. Const. Co., La.App. Orl., 44 So.2d 732; Costanza v. Southern Farm Bureau Casualty Ins. Co., La.App. 3 Cir., 124 So.2d 621, certiorari denied; 2 Larson's Workmen's Compensation Law, Sec. 79.74, page 311. In this case, however, the moving pictures are supported by the testimony of two private investigators to the efect that they observed plaintiff performing the same type of duties as were shown in the picture over sustained periods of time with little or no rest, and by the testimony of the owner of the service station to the effect that plaintiff customarily performed his duties at the station as shown in the motion pictures. In our opinion these pictures and this testimony completely refute plaintiff's statements as to his inability to bend his body forward to any great extent and as to his inability to lift heavy objects.
A review of all of the evidence convinces us, as it did the trial judge, that plaintiff fully recovered from his leg and back injuries before March 11, 1959, and that he has not been physically disabled since that time.
Although we recognize that a post traumatic neurosis may be disabling and in a proper case may be compensable, the evidence in this case does not convince us that plaintiff is disabled from any such condition. We base that conclusion to some extent on the fact that plaintiff incorrectly represented to the trial court that his ability to bend his body forward was very limited, and we assume that he also greatly exaggerated his complaints during the course of examinations given by the doctors who diagnosed his condition as being neurotic in nature. Such a diagnosis was made largely upon the assumption that plaintiff's subjective complaints were genuine.
Assuming, however, that plaintiff is presently disabled because of an anxiety neurosis, as found by Dr. Kirkpatrick, we feel that the evidence fails to establish a causal connection between his present disability and the accident which occurred on February 12, 1959. Dr. Kirkpatrick indicated that plaintiff's depression, despondency, nervousness and pain which "seems to be real to him," were brought about by a number of circumstances. Included among these were the development of impotency (which was not mentioned by plaintiff until November, 1959, and is not shown to have any causal connection with his employment), the fact that he had been seen by several doctors who could find nothing wrong with him, worry about his income, his failure to obtain Welfare assistance, and hostility toward his former employer.
*528 Although Dr. Kirkpatrick feels that the accident of February 12, 1959, was the "precipitating factor" which brought about the anxiety neurosis, it seems to us that any or all of the above mentioned circumstances, which also were factors in bringing about the neurosis, could have existed with the same result even though no accident occurred. Most of the circumstances which caused plaintiff to develop this neurotic condition occurred after plaintiff had fully recovered from his injury, and we think the evidence fails to establish a causal connection between the accident of February 12, 1959, and the neurosis which Dr. Kirkpatrick found to exist.
In our opinion plaintiff has failed to establish that he has been disabled since compensation payments were discontinued, or that the neurosis which he may now have is attributable to the accident which occurred during the course of his employment by defendant. The trial judge, therefore, correctly rejected plaintiff's demands.
Accordingly, for the reasons herein assigned, the judgment of the trial court is affirmed. The costs of this appeal are assessed to plaintiff-appellant.
Affirmed.
TATE, Judge (dissenting).
In my opinion, the very great preponderance of the evidence in this record proves that the claimant is, by reason of the industrial accident's residual, disabled from the performance of the heavy manual labor in which he had been employed his entire life up until the injury, the three years preceding which being in a steady job with the defendant employer.
Based upon numerous examinations and objective symptoms such as muscle spasm and atrophy, three out of the four doctors who had examined the claimant in the year preceding the trial found him to be disabled, and these three doctorswho together had examined or treated the claimant for a total of 88 occasionswere treating the claimant as a patient and trying to reduce his disability. The only other doctor who saw the claimant during this time saw him twice, and then only for purposes of litigation; he positively concluded that the claimant was malingeringthat the rigidity of the claimant's muscles was not a "true" muscle spasm, such as found to be by the other physicians, and that the atrophy in the plaintiff's thigh noted by the other physicians simply did not exist.
In reading the record and trial court's reasons for judgment, I think it can be seen how our learned, conscientious, and fair trial brother inadvertently fell into error.
The plaintiff's very substantial medical case was heard on September 8th and 9th, 1960, and the trial was then continued. The trial was resumed twenty days later, on September 29th, at which time the able counsel for the defendants showed approximately ten minutes of none-too-clear rapid film, which conclusively showed that the claimant had been inaccurate in telling the trial judge he could not even bend down, etc. The trial court then immediately ruled from the bench, dismissing the plaintiff's suit but not mentioning the above-cited substantial medical testimony introduced by the plaintiff; approximately half of the reasons for judgment concerning the ten minutes of film, the court stating that such film showed that "plaintiff is able to do extremely hard and heavy work without any show or sign of pain".
It seems obvious to the writer that too much weight was accorded the ten minutes of motion pictures showing snatches of the plaintiff at work, since such pictures, of course, do not show the rest periods, nor whether or not plaintiff suffers pain in the performance of the duties, nor whether the plaintiff suffers after effects from performing such duties. See Costanza v. Southern Farm Bur. Cas. Ins. Co., La.App. 3 Cir., 124 So.2d 621, certiorari denied. See also 2 Larson's Workmen's Compensation Law, Section 79.74, page 311: "Although on the surface it might appear that nothing could *529 be more cogent and even dramatic refutation of a disability claim than motion pictures of claimant jacking up a car or playing tennis, the courts have rightly observed that such evidence must be used with great caution." Error was also committed in assigning too great a weight to the opinion of physicians who saw the plaintiff on only a few occasions and then principally for the purpose of examination in connection with this litigation, and not enough weight was accorded to the testimony of three attending physicians who examined and treated the plaintiff on many more occasions. See Finley v. Hardware Mut. Ins. Co., 237 La. 214, 110 So.2d 583; Stringer v. Brown Paper Mill Co., 224 La. 964, 71 So. 2d 343; Mitchell v. Morgan Roofing Co., La.App. 1 Cir., 118 So.2d 492.
In my view, the testimony of Doctors Purpera, Kirkpatrick, and Zink is entitled to great weight since they examined and treated the claimant on many occasions over an extended period of time and especially since their diagnoses of disability were in their opinion corroborated by objective and consistent symptoms. (Dr. Purpera had for instance treated the plaintiff approximately 71 times between March 5, 1959 and the trial in September of 1960, for a long period treating the plaintiff several times weekly; Dr. Zink had examined and treated the plaintiff six times between June 13, 1960 and the trial; and Dr. Kirkpatrick had examined and treated the plaintiff eleven times.)
Up until October of 1959 Dr. Purpera noted muscle spasm on many occasions, although sometimes absent, as corroborative of the lumbosacral strain. Also, on May 6, 1960, he for the first time measured the right thigh as compared to the left and found that the left thigh was approximately one inch smaller than the right, which all medical witnesses herein conceded was a significant atrophy indicating disuse of the left leg. Dr. Zink, examining the plaintiff on June 13, 1960, also found this atrophy and further noted muscle spasm in the lumbar muscle; treated him several times for a residual lumbosacral strain; and found the atrophy still present on September 6, 1960, his last examination before the trial.[1] Both of these medical experts attributed this atrophy of the left thigh to the pain in the lower back of which the plaintiff complained.
Dr. W. L. Kirkpatrick, a neuropsy-schiatrist, first examined the claimant on November 2, 1959, and had examined or treated him on ten further occasions between that date and the trial in September, 1960. While not ruling out an organic cause for the plaintiff's complaints of back pain, this specialist (the only one who testified in the field of psychiatry) testified positively that in his opinion the plaintiff was totally disabled from the performance of hard labor by a genuinely felt back pain through an anxiety neurosis which was precipitated by the accident at work. The doctor estimated that at least a further eighteen months, more or less, of psychotherapy was needed to rehabilitate the plaintiff for a return to employment, although he further admitted that such prognosis was not assured since the disabling neurosis might possibly remain chronic. Tr. 156, 159.
Dr. Kirkpatrick's diagnosis was founded upon an extended period of observation. It was based both upon the claimant's history and upon his observation of what he denoted as "definite objective findings that *530 you can see in any neurosis, such as anxiety in all of its forms, such as extreme tremulous shaking, excessive sweating, extreme restlessness, very anxious appearance to the face, a lack of ability to comprehend, and usually an anxious person has impairment of memory capacity. We can pick up some definite objective signs, which when we tie them all together gives a positive diagnosis * * *." Tr. 151.
In this physician's own words:
At Tr. 153:
"Q. What anxiety did he express or did he demonstrate when you saw him and treated him? A. Well, he seemed to have the appearance of a person who is afraid, anxiety actually in a neurotic is fear, but it is fear with nothing external to be afraid of, so apparently the fear comes from inside; he appeared afraid. He was restless; he was nervous and obviously tense. He complained of headaches with tightness over the back of the neck, which is a common symptom of a tense headache that occur in neurotics. The neck muscles tighten up in tension to almost as hard as a board and very painful sometimes with those headaches. I think that is the main aspects of it.
"Q. You found these signs of anxiety in Robert Lambert in your examinations? A. I found them in some of my examinations. They weren't present in all."
And at Tr. 167:
"A. I guess anybody could simulate pain, yes, but it's very difficult to simulate pain in exactly the same manner and simulate the same symptoms in exactly the same manner over an eighteen month period. That is where malingerers trip themselves up, they can't remember all the things that they are supposed to do, and they frequently move when they shouldn't and trip themselves up. It is awful hard to simulate a neurosis over an eighteen months period, almost impossible."
This physician also was "fairly conclusive" in ruling out malingering based upon the following factors. Tr. 168-169:
"A. One, the previous good work history, two, the symptom of impotence which he stated that he had which a malingerer I don't feel would have thought of, both malingerers and neurotics have sudden on set of symptoms, three, malingerers hate medical examinations, they try to avoid them as much as possible. He sought out medical examinations and wanted help and he was quite concerned when apparently nothing severely wrong with him was found, four, the fact that he did have transient periods of improvements over this period of time, whereas a malingerer usually does not show an improvement, five, I think it would be very difficult for aperhaps a malingerer with a high intelligence could simulate a neurosis over this period of time, but I don't feel that Robert has that intellectual capacity to simulate this condition that he appears to have over such a long period of time. Malingerers are usually average intelligence or above whereas neurosis can affect any level of intelligence except extremely low levels."
The opinion of these three physicians is entitled to much greater weight, under the circumstances of this case, than that of Dr. Fournet (who had not examined the plaintiff since February 27, 1959, about two weeks after the accident and almost 17 months before the trial) and of Dr. Accardo (who had examined the claimant only once, and then on May 20, 1959, about 15 months before the trial). Known to the court to be well qualified and conscientious, Dr. Gilly examined the plaintiff on three occasions: March 31, 1959 (at the request of the plaintiff's attending physician); June 9, 1960; and September 7, 1960 (the latter *531 two examinations being at the request of the defendants). On each of these three examinations Dr. Gilly found no objective symptoms of disabilityno muscle spasms and no atrophy (being asked specifically to examine for the latter in the face of contrary findings by other physicians). He reached the definite conclusion that the plaintiff was consciously exaggerating his symptoms. Dr. Gilly was of the firm opinion that the claimant had been able to return to work upon all occasions examined.
Dr. Gilly did note a rigidity of the plaintiff's muscles, but he felt such not to be a "true" muscle spasm on the basis of tests which convinced him that such muscle contracture was voluntarily produced by the plaintiff. He also noted variable responses to the pin prick test which convinced him that any claimed loss of sensation was feigned.
As to the absence of muscle spasms on the three widely-spread occasions that Dr. Gilly examined the claimant, the other medical testimony indicates that pain does not necessarily and always produce such an objective symptom, and these other physicians who saw the claimant on many more occasions noted that the muscle spasms were sometimes present and sometimes absent. As for the atrophy or not of the plaintiff's left leg, it can only be said that two other qualified physicians did find such atrophy on several occasions and that the preponderance of the evidence proves such objective finding, which to some extent substantiates the plaintiff's complaints of pain.
The only other medical evidence relied upon able counsel for the defendants-appellees was as follows: The claimant was admitted to the Veterans Administration Hospital in Alexandria on July 8, 1959, based upon his subjective complaints of back pain. He was treated with muscle relaxants, physical therapy, and rest on a fracture board until July 28th. The hospital report concludes that such treatment "was continued and the pains in the back soon subsided. As no further hospitalization indicated, patient is to be discharged and may resume his usual activities." In the opinion of the medical experts testifying for the plaintiff, this episode tended to corroborate the veracity of the plaintiff's complaints, since rest and treatment may give relief to a patient truly suffering from a lumbosacral strain, even though it does not rule out a reactivation upon a return to more strenuous activity if the strain has not been cured.
In the oral reasons for judgment rendered on September 29th, the trial court did not refer to the testimony of Doctors Purpera, Kirkpatrick, and Zink on September 8th and 9th, all of whom were attending physicians and all of whom had concluded, both on the basis of history and also of objective symptoms, that the plaintiff was disabled by reason of a genuinely felt back pain resulting either from a traumatic neurosis or a residual lumbosacral strain, or a combination of both, resulting from the accident. If the opinion of these doctors had been based principally upon their own evaluation of the plaintiff's credibility and not substantiated by objective symptoms, then, even though the preponderance of the medical evidence as represented by their views seemed to prove the claimant's disability, I do not believe that it would be within the province of an appellate court to reverse the trial court's factual conclusion that the plaintiff was not disabled. See Richard v. Barber Brothers Co., La.App. 1 Cir., 112 So.2d 168. But this is not the case here. See Finley, above-cited, and Miller, below-cited, opinions.
Or, if the work activities reflected by the defendant's investigators were inconsistent with these diagnoses, it would be difficult to square such activities with a genuinely felt pain. But, instead, all of these attending physicians felt that such part-time short-interval performance of heavier duties was not inconsistent with their diagnoses (and were indeed recommended), although they felt that the plaintiff *532 could not earn his living by reason of the resulting pain through the constant performance of such duties throughout each day and day by day. Both the plaintiff and his wife testified, and they had reported to the same effect to the attending physicians during the course of the latter's treatment, that the part-time work reactivated the plaintiff's pain and produced much discomfort following each day's work.
It should be added that, in view of this testimony by these physicians and the claimant, I do not think to be so damaging the testimony of the defendants' investigators and the motion picture taken by them showing that the plaintiff on occasions changed tires at work, bent over, stooped, or squatted on the four Saturdays they saw him at work for the service station. (Further, the service station owner, subpoenaed by the defendants testified that he had hired the plaintiff to work on Saturdays for several months principally as wash boy and to do other light work, and a coemployee testified that the claimant complained of back pains so that he could not stoop down to wash the tires.)
The principal effect of these movies and of such testimony, however, is to indicate that the claimant's testimony to the trial court that he could not bend or stoop was probably consciously untruthful. This circumstance, together with the plaintiff's having appeared at the trial with a limp in his right leg (whereas the testimony of the physicians and the atrophy were indicative of trouble with the left), are the probable reasons the trial court attached very little weight to the plaintiff's credibility. And this ordinarily may well be a sound reason for viewing with suspicion psychiatric or other medical opinions of disability insofar as founded upon an acceptance as correct of the plaintiff's history and complaints as given by him to the attending physicians.
But in the present instance, as in Miller v. United States F. & G. Co., La.App. 2 Cir., 99 So.2d 511, certiorari denied (where likewise the appellate court reversed the trial judge), the preponderant medical evidence supports a recovery for the claimant, despite the latter's conscious exaggerations of his ailments and despite movies showing that he engaged in some activities that at the trial he said he could not do. The test of recovery in a compensation suit is disability, not veracity. Johnson v. Calcasieu Paper Co., La.App. 1 Cir., 95 So. 2d 659.
It is also suggested that, even if the claimant is disabled by a neurosis, he nevertheless cannot recover because the neurosis is not causally connected with the accident since so many other factors contributed to itsuch as the impotency developing about eight months after the accident, the frustration of the doctors who could not discover the plaintiff's disability and of the plaintiff's loss of income and failure to obtain welfare assistance, his hostility towards his former employer who refused to let him return to light work, etc.
All of these factors were of course a result of the accident and the initial disability, the impotency according to the uncontradicted expert psychiatric testimony being a symptom of the neurosis, as well as a recognized psychological reaction to the plaintiff's dire emotional and financial straits resulting from the accident. To hold that the disabling neurosis, which the uncontradicted expert testimony shows to have been precipitated by the accident and the immediately resulting physical disability, has no causal relation to the accident simply finds no basis in the medical testimony.
The assumption that a neurosis may never be compensable unless it appears full blown, like a broken leg, right after the accident is contrary to the jurisprudence, which we are duty-bound to follow. The disabling neurosis often results gradually, as did the present, from a cumulation of frustrations and tensions within the individual; but it would not have appeared had the industrial accident not subjected *533 the individual to additional emotional strain by reason of these additional accident-caused tensions. The accident is thus regarded as having precipitated into an active and compensable disability what formerly was just a latent or a non-disabling emotional instability.
For these reasons, I must respectfully dissent from the opinion of my esteemed brethren of the majority.

On Application for Rehearing.
En Banc. Rehearing denied. TATE, J., dissents.
NOTES
[1] Dr. Zink also found x-ray findings suggestive of an old fracture of the lower or floating ribs, which he thought could have resulted from the accident and original strain; however, he conceded that such rib injury, if any, did not result from the trauma if there were no serious complaints of pain in the rib area at the time of the accident and immediately thereafter, and there were none. Dr. Gilly thought these findings representative of a congenital or developmental defect. Dr. Zink also noted a varicose vein condition in the plaintiff's lower left leg, which he ruled out as being causally related either to the accident or to the atrophy in the left thigh.