408 So.2d 352 (1981)
Charles GLOVER
v.
SOUTHERN PIPE & SUPPLY COMPANY & Chubb Pacific Indemnity Company.
No. 12712.
Court of Appeal of Louisiana, Fourth Circuit.
December 17, 1981.
Writ Denied February 19, 1982.
*353 Orlando G. Bendana and Wayne H. Carlton, Jr., New Orleans, for plaintiff-appellant.
Christovich & Kearney, Paul G. Preston, New Orleans, for defendant-appellee.
Before GULOTTA, GARRISON and BARRY, JJ.
BARRY, Judge.
Plaintiff appeals from an adverse judgment denying disability benefits as a result of injuries received during his employment.
Plaintiff was employed by Southern Pipe & Supply Co. as a truck driver/laborer. He was standing on a pallet of wet pipes and fell approximately twelve feet to the ground striking his back on a two by four. His foreman witnessed the fall and testified that plaintiff was holding the side of his ribs and complaining of pain. The record includes testimony from five medical practitioners who presented conflicting opinions concerning plaintiff's prognosis and ability to resume employment. In addition, Southern's insurer produced two motion picture films taken by a private detective which attempted to contradict plaintiff's testimony concerning his inability to function.
In written Findings of Fact and Reasons for Judgment the trial judge held that the plaintiff was injured on the job in the course and scope of his employment and briefly notes the medical testimony. Our learned colleague proceeds to emphasize plaintiff's testimony that he could not stoop, bend, or lift anything around the house or on the job. It then appears plaintiff's lawsuit was dismissed because of the movie film showing plaintiff picking up and carrying laundry. The Reasons for Judgment conclude: "In short, the film completely refutes all the plaintiff and his witnesses had to say, and conclusively shows the plaintiff, without any difficulty whatsoever, stooping, bending, lifting and carrying objects."
In reading the entire record and comparing the trial court's Reasons for Judgment, we feel our experienced and conscientious trial brother inadvertently committed error by assigning too much weight to the opinion of physicians who examined plaintiff for the purpose of this litigation, and far too much weight to the very brief motion pictures showing plaintiff performing one menial task.
Following his fall on May 16, 1980, plaintiff could not walk and was driven to the hospital by his foreman. He was examined in the emergency room by Dr. J. D. Thames, a general practitioner, and admitted as an inpatient where he remained for ten days. By deposition Dr. Thames testified that his initial diagnosis was strained muscles of the back. The hospital records reflect that Dr. Thames' "impression" upon plaintiff's hospital admission was "severe contusion, left side, lower back with strained muscles."
Dr. Thames did not testify concerning plaintiff's treatment in the hospital. The hospital records reveal plaintiff was on pain relievers, tranquilizers, and muscle relaxers (Demerol, Dalmane, Vistaril, Parafon Forte, Valium, Tylenol with Codeine, and Flexaril). A bed board was placed under his mattress and a heating pad on his back daily. Dr. Thames' discharge note states: "On the tenth hospital day, patient had shown considerable improvement and was discharged on medications consisting of Parafon Forte, Valium 5 mg and Darvoset N100 when necessary for pain. He was advised to report to my office for daily heat treatments of his back."
During plaintiff's hospitalization Dr. Thames consulted Dr. J. L. Fambrough, an orthopedist, whose deposition states ... "it was my opinion at that time that he had an acute lumbosacral strain ...". Positive findings by Dr. Fambrough revealed plaintiff could only reach down to approximately the bottom of his knees and the straight leg *354 raising test in a sitting position was positive with regard to low back pain at about sixty or seventy degrees. Dr. Fambrough did not feel plaintiff's symptoms were associated with a disc. When asked what symptoms would indicate a disc he replied "a person can presentif a person has a herniated disc or ruptured disc, they may present with just back pain."
Following his discharge from the hospital plaintiff had four office visits with Dr. Thames during which he received diathermy treatments to his back. Dr. Thames prescribed muscle relaxants and tranquilizers and discharged plaintiff on June 3, 1980.
On June 9, 1980 plaintiff was examined by Dr. Charles H. Gideon, a chiropractor, whose diagnosis was a cervical sprain. From this initial visit until September 16, 1980 Dr. Gideon administered therapy and manipulation on twenty-five separate occasions: seven in June, twelve in July, four in August, and two in September. Treatment included manipulative corrections, electrical muscle stimulation, motorized traction, and heat. Dr. Gideon noted that the cervical sprain was accompanied by concomitant paravertebral myofascitis with flexion subluxation. He testified plaintiff complained of headaches, left lower thoracic pain, and left lumbosacral pain radiating down the back of his left leg into his toes. Dr. Gideon recommended periodic evaluation, including x-rays, to evaluate plaintiff's improvement and post-traumatic pathology and disability, if any. It was Dr. Gideon's opinion that plaintiff's injury was complicated by failure to reduce the subluxations at the time of his injury.
Dr. H. R. Soboloff, an orthopedist, examined plaintiff on July 15, 1980 at the request of the insurer. By deposition he stated that the straight leg raising test was positive in the supine position with soreness in the left side and plaintiff complained of soreness in the left flank area upon palpation. Dr. Soboloff opined that plaintiff felt pain in the left lumbosacral area and objectively there was soreness in the left flank, predominantly the kidney area, and suggested a urologist be seen; otherwise, the examination was negative. Dr. Soboloff stated that as of the date of his examination (two months post-accident) he would not allow plaintiff to perform heavy manual labor: "Heavy-duty work I would say he's disabled. He could do light work, sitting at a desk or bench and not have to lift things. He could do things of that nature but I would not recommend that he do heavy-duty work unless he was thoroughly screened and was found to be negative in all areas."
On September 8, 1980 plaintiff saw Dr. Stuart I. Phillips, an orthopedic surgeon, who testified he found muscle spasms in the lower back and limited motion. Dr. Phillips said the plaintiff could not bend and touch his toes and had a positive straight leg raising test. X-rays of the lower spine showed a slight decrease in the lumbosacral area. It was Dr. Phillips' opinion that plaintiff had a probable lumbar disc, but not sufficiently acute for hospitalization or surgery. During Dr. Phillips' next examination on October 20, 1980 plaintiff complained of neck pain. Dr. Phillips noted that it was not uncommon for symptoms of this type to "wax and wane". He recommended that plaintiff should not perform repetitive heavy lifting and for him to return in six weeks.
Plaintiff's last examination by Dr. Phillips was on December 2, 1980, sixteen days prior to trial and the orthopedist found that plaintiff's condition had worsened due to more spasms and additional limited motion. Dr. Phillips testified: "It was in my opinion now about six months from the time of injury and was getting to the time when if the patient doesn't respond to conservative treatment, he starts thinking about doing other things, and I asked him to come back after the first of the year, at which time we'd make up our minds if his pain was sufficiently severe to require him to be put in the hospital and worked up, normal testing that we do to see whether or not he has a ruptured disc." It was Dr. Phillips' opinion that plaintiff was disabled at the time of his first examination on September 8, 1980 from his normal occupation as a truck *355 driver, and was "clearly" disabled at the time of trial. He concluded that a lumbar disc is the most likely diagnosis and estimated a present twenty-five percent disability of the lumbar spine.
Dr. Fambrough, who saw plaintiff on May 23, 1980 in consultation and opined that plaintiff had an acute lumbosacral strain, examined plaintiff again at defendant's request prior to trial on December 8, 1980. Dr. Fambrough's deposition states that "... I couldn't palpate any muscle spasms definitely, however, just lightly palpating the lumbar musculature caused considerable vocal discomfort, and the plaintiff would pull away from me". There was no thigh atrophy of either leg. Dr. Fambrough did not see fit to repeat his x-rays because "I felt that since Dr. Phillips would apparently admit him to the hospital that he should go ahead and pursue that course".
In summary of the medical record, Dr. Thames, general practitioner, found objective symptoms of lumbosacral strain and diagnosed contusions of the back following ten days hospitalization and discharged plaintiff eighteen days post-accident as fit to resume employment. We note with interest a statement by Dr. Thames that "A disc is usually preceded by an injury of a year's duration gradually coming on and you get other problems with it, with the extremities, the muscles begin to atrophy and the reflexes begin to diminish and they get numbness in the involved leg, and that's not going to develop in a month or two after they have had a back injury. A disc is a slow process." Dr. Thames' opinion eliminates the possibility that he would find a disc problem during his brief treatment of plaintiff.
Plaintiff then immediately turned to Dr. Gideon, the chiropractor, who treated plaintiff twenty-six times during the next nine weeks. His x-rays and examinations showed a chronic lumbosacral neuralgia, cervical and thoraco-costal strain with a prognosis of intermittent pain and stiffness in the cervical and lumbar regions.
We are impressed with the testimony of Dr. Phillips, an orthopedist and the treating physician at the time of trial. Dr. Phillips' testimony is most convincing that plaintiff is probably suffering from a ruptured lumbar disc and is clearly disabled. He unequivocally stated that the plaintiff was disabled from the date of his first visit until the time of trial.
The two other physicians saw plaintiff on a total of three occasions. Dr. Fambrough saw plaintiff in the hospital following his accident at which time his diagnosis was an acute lumbosacral strain. His second and last examination was for litigation purposes at which time he did not take x-rays. He agreed that Dr. Phillips "... should go ahead and pursue that course...", referring to hospitalization and testing for a ruptured disc.
Defendant's other physician, Dr. Soboloff, saw plaintiff on one occasion two months post-accident and found no objective orthopedic problem but recommended examination by a urologist.
We conclude that the preponderant medical evidence supports a finding that the plaintiff was patently disabled at the time of trial as a result of his job-related injury.
In his Reasons the trial judge gave great weight to the films[1] and stated they completely refuted plaintiff's testimony on his inability to stoop, bend, lift.
Defendant's two 8 mm movies taken by a private investigator shortly before trial are *356 brief and cover a very short time span. The pictures show plaintiff carrying an armful of clothes in a small plastic basket as he leaves the front door of a house and walks across a porch and down two steps (the porch to the ground appears to be approximately eighteen inches). He proceeds to an automobile parked next to the house and places the basket of clothes in the back seat, then walks back to the steps, up to the porch and into the house. Later the automobile returns and plaintiff again leaves the porch and goes to the vehicle, retrieves the clothes, and carries them in his arms back into the house. During one trip from the house plaintiff steps from the porch to the ground without using the steps. In his Reasons the trial judge recalls the plaintiff saying that he could not stoop, bend or lift anything around the house and then refers to Dr. Phillips' testimony that his diagnosis was based in part on plaintiff's inability to stoop, etc. Because the movies show plaintiff carrying clothes and placing them in the back seat of an automobile, the trial judge concluded that the film "completely refutes all the plaintiff and his witnesses had to say, and conclusively shows the plaintiff, without any difficulty whatsoever, stooping, bending, lifting and carrying objects." (emphasis supplied)
All provisions of the workmen's compensation statute are to be liberally construed in favor of claimants. LSA-R.S. 23:1209 Johnson v. Aetna Casualty & Surety Company, 387 So.2d 1340 (La.App.1st Cir. 1980). The totality of the evidence, both medical and lay, must be examined by the court in making its determination of whether to grant an award of workmen's compensation benefits for disability. Simpson v. S. S. Kresge Company, 389 So.2d 65 (La.1980). We feel too much weight was accorded the few minutes of motion pictures showing an isolated scene during which plaintiff performed a very menial chore requiring no stress and little strength. Evidence in the form of moving pictures must be used with great caution because such pictures show only very brief intervals of the activities of the subject. They do not show rest periods, they do not reflect whether the subject is suffering pain, and they do not show the after-effects of the activities. Lambert v. Wolf's, Inc., 132 So.2d 522 (La.App.3d Cir. 1961); Gagliano v. Boh Bros. Const. Co., 44 So.2d 732 (La.App.Orl. 1950). The finding of fact by the trial court is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Certainly the weight of the clothes was not substantial nor was plaintiff in a bending position more than a few seconds. "Although on the surface it might appear that nothing could be more cogent and even dramatic refutation of a disability claim than motion pictures of claimant jacking up a car or playing tennis, the courts have rightly observed that such evidence must be used with great caution." 2 Larson's Workmen's Compensation Law, Section 79.74, page 311. The intent of the movies was to discredit and refute plaintiff's testimony, but we feel the movie's content falls far short and the medical testimony substantiates plaintiff's claim.
The insurer's claims supervisor testified that plaintiff was paid disability benefits for eight weeks at $117.00 per week totaling $936.00 and $2,571.47 in medical payments. The claims supervisor testified that disability benefits were terminated when Dr. Thames released plaintiff to go back to work and also because of Dr. Soboloff's examination.
Plaintiff urges that refusal to continue/reinstate compensation was arbitrary and capricious so as to warrant penalties. This is a factual determination which must be made upon the facts of each case. Here there was a legitimate reason for the defendant to terminate benefits after plaintiff was discharged by his first treating physician. We find no basis to conclude that the defendant was arbitrary and capricious.
The criteria to determine whether disability is temporary or permanent is claimant's condition at the time of trial. LSA-R.S. 23:1221(1, 2) Carruth v. Louisiana Motor Inns, 389 So.2d 99 (La.App. 4th Cir. 1980). "A judgment for total permanent disability *357 should be awarded when the claimant is shown to be totally disabled at the time of trial and the duration of such disability is indefinite or the evidence does not clearly indicate its duration." Walker v. Gaines P. Wilson & Son, Inc., 340 So.2d 985 (La.1976); Wiley v. Southern Casualty Insurance Company, 380 So.2d 214 (La.App.3d Cir. 1980). At the trial Dr. Phillips testified plaintiff was clearly disabled and thus entitled to benefits under LSA-R.S. 23:1221(2).
For the foregoing reasons the Judgment of the District Court is hereby reversed and set aside.

DECREE
IT IS ORDERED that there be judgment in favor of Charles Glover and against Southern Pipe and Supply Co. and Chubb Pacific Indemnity Co., in solido, awarding workmen's compensation benefits to Charles Glover at the rate of $117.00 per week commencing on May 16, 1980, subject to a credit for any benefits previously paid, plus legal interest on each weekly installment from due date until paid. Defendants are also ordered to pay all medical expenses due under the compensation law subject to a credit for amounts previously paid. Defendants are assessed all costs of this appeal.
REVERSED AND RENDERED.
GULOTTA, Judge, concurring.
I concur.
Although the motion pictures were not devastating to plaintiff's cause, they do raise questions as to the extent of his disability. Nonetheless, the medical evidence considered, I concur with the result that plaintiff was disabled at the time of trial. My concurrence is based upon the realization that, upon a medical showing of no further disability, payments may be discontinued under LSA-R.S. 23:1221(1) or (2).
NOTES
[1] Plaintiff was not aware of the films and requested that he be allowed to recall Dr. Phillips to explain plaintiff's movements on film. The trial judge denied the request. We feel plaintiff clearly had the right to rebut defendant's evidence (C.C.P. art. 1632) and the right of cross-examination under C.C.P. art. 1634. In light of the great weight the trial judge gave to the films, his refusal to allow plaintiff to recall the doctor to rebut the films was possibly a denial of these rights. (See Launey v. Traders and General Insurance Company, 169 So.2d 757 (La.App.3d Cir. 1964) at p. 760.) Reggio v. La. Gas Service Co., 333 So.2d 395 (La.App.4th Cir. 1976) also implies plaintiff should have been allowed some opportunity to "cross-examine" the films.