448 So.2d 745 (1984)
Angela RAMSEY
v.
DRAGON LIMITED.
No. CA-1416.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 1984.
*746 Frank S. Bruno, Frank A. Bruno, Bruno & Bruno, New Orleans, for plaintiff-appellant.
Robert J. Neal, New Orleans, for defendant-appellee.
Before BARRY, AUGUSTINE and CIACCIO, JJ.
BARRY, Judge.
Plaintiff, Angela Ramsey, was awarded compensation benefits under the specific loss section (for both legs) of LSA-R.S. 23:1221(4) and appeals claiming permanent partial disability. It is undisputed that under this classification Ms. Ramsey would be entitled to compensation at the stipulated rate of $183.00 per week.
On July 24, 1982 Ms. Ramsey worked for Dragon Limited, the defendant, as an apprentice cement finisher and suffered an irritant reaction to cement. That evening she noticed a rash and itching from both knees to the ankles. The next day she told her foreman who advised home remedies. She worked three more days, was assigned light duty on the fourth day, but worked that afternoon on her knees. Ms. Ramsey testified that night her legs were very inflammed and throbbing woke her from sleep. She described her legs as "jet black like they had been painted." On July 30 she was sent to Dr. Richard Faust, the company doctor, who administered a tetanus diphtheria toxoid injection, prescribed a topical creme and home ice application, and discharged her to resume work after three days. Over the weekend her symptoms worsened and on August 3 she returned to Dr. Faust who extended her disability to August 7, 1982.
On August 13, 1982 Ms. Ramsey saw Dr. Vance Marinello, a dermatologist, who treated her until March 29, 1983, less than one week prior to trial. It is clear from Dr. Marinello's testimony that plaintiff's condition had not resolved by the time of trial on April 4, 1983.
No compensation was paid and Ms. Ramsey did not go back to work. Medical testimony was from Dr. Marinello and Dr. Charles R. Billings, an orthopedic surgeon who evaluated Ms. Ramsey on November *747 19, 1982 at Dr. Marinello's request. The defendant submitted a report from Dr. Monroe Laborde, an orthopedic surgeon, who examined her on March 9, 1983. Dr. Faust's medical report was admitted only on the question of penalties and attorney fees.
The trial judge found Ms. Ramsey "has not attempted any employment since this incident, notwithstanding, that she can return to any occupation of her choice without any disability, and can return to work as an apprentice cement finisher, with knee pads." But contradictorily he found:
Plaintiff was partially disabled because the injury rendered her unable `to perform the duties in which she was customarily engaged when injured or duties of the same or similar character, nature, or description for which she was fitted by education, training, and experience....' See Dufrene v. St. Charles Parish Police Jury, 371 So.2d 378 (La. App. 4th Cir.1979). [LSA-R.S. 23:1221(3)] (Emphasis ours.)
After citing R.S. 23:1221(3) on partial disability, the trial judge applied the specific loss provisions of R.S. 23:1221(4) to set the award:[1]
The plaintiff is entitled to the scheduled disability of each extremity computed at the rate of $55.00 minimum for 175 weeks or a total of $9,625.00 for each leg for a total of $19,250.00, less credit for any payments made.
The court awarded $516.00 for medical bills[2] (subject to payments) and expert fees. Penalties and attorney's fees were denied because the defendant was not timely notified of the claim.
Ms. Ramsey submits the trial judge correctly found partial disability, but erroneously set the award based on the specific loss schedule. She now seeks to have the judgment amended to provide compensation for 450 weeks under the partial disability section.
The defendant counters that Ms. Ramsey's work history as an apprentice cement finisher "is at best, spotty", implying she had no specific trade. It asserts she failed to prove partial disability because there is no proof her earning capacity diminished or she cannot resume work as an apprentice cement finisher. Defendant acknowledges the judgment is inconsistent, but argues the factual findings are consistent with the award.
LSA-R.S. 23:1221(3) and (4) provide in part:
(3) For injury producing partial disability of the employee to perform the duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, and experience, sixty-six and two-thirds per centum of the difference between the wages the employee was earning at the time of the injury and any lesser wages which the injured employee actually earns in any week thereafter in any gainful occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training, and experience, during the period of disability.
* * * * * *
... and not beyond a maximum of four hundred fifty weeks for such partial disability resulting from injury occurring on and after September 1, 1977;
(4) In the following cases, the compensation shall be as follows:
* * * * * *

*748 (h) For the loss of a leg, sixty-six and two-thirds per centum of wages during one hundred seventy-five weeks.
* * * * * *
(o) In all cases involving a permanent partial loss of the use or function of the members mentioned hereinabove, compensation shall bear such proportion to the amounts named herein for the total loss of such members as the disability to such members bears to the total loss of the member, provided that in no case shall compensation for an injury to a member exceed the compensation payable for the loss of such member.
The claimant's condition at the time of trial is the criteria to determine if disability is permanent or temporary, partial or total. Knott v. Welltech, Inc., 428 So.2d 1221 (La.App. 3d Cir.1983). The injured employee is partially disabled if she is unable to perform the duties in which she was customarily engaged when injured or duties of the same or similar character for which she is fitted by training, education or experience. LSA-R.S. 23:1221(3), Oregon v. Tri-State Road Boring, Inc., 434 So.2d 65 (La.1983). Also, the worker is partially disabled if there is substantial pain when engaging in her former occupation, even if she can work in other types of jobs without pain. Patin v. Continental Casualty Co., 424 So.2d 1161 (La.App. 1st Cir.1982) writ denied, 429 So.2d 145 (La. 1983). Inability to work and working in pain are questions of fact and will not be disturbed unless clearly wrong. Crump v. Hartford Accident and Indemnity Co., 367 So.2d 300 (La.1979).
The record shows that Ms. Ramsey, 40 years old, is a member of the Cement Mason's Union and was working under an organized apprentice program. She stated by deposition she was an apprentice approximately four years and her work was usually obtained through a foreman or the union. She dropped out of the union for about a year and after rejoining held two or three jobs before working for the defendant.
Ms. Ramsey testified she tried to return to her former occupation on one occasion, but her legs got very swollen, she couldn't sleep, and this convinced her it was impossible to continue in her trade. This testimony was uncontradicted, but the trial judge erroneously concluded: "[s]he has not attempted any employment since this incident, notwithstanding, that she can return to any occupation of her choice without any disability and can return to work as an apprentice cement finisher...." Plaintiff's deposition (cited by defendant at length) related her attempt to resume work and she presented to defendant's attorney a check stub for the period ending February 24, 1983, indicating she had worked 10 hours. (Deposition pp. 7, 8.)
Dr. Marinello, dermatologist, saw Ms. Ramsey on August 13, August 23, September 16, October 19, December 22, 1982 and March 29, 1983. He diagnosed her condition as "crusted skin erosion secondary to cement exposure by history with secondary infection." She was treated with topical and systemic steroids, compresses and systemic antibiotics. In November she was referred to Dr. Billings (orthopedist) to evaluate deep muscle tendon or joint problems. In December she was patch tested which revealed no allergy to components of cement dust. On March 29 (one week before trial) Ms. Ramsey complained of numbness and tingling. Dr. Marinello performed a pin prick test, an objective test, which confirmed the complaint.
Accordingly, Dr. Marinello's opinion at trial was clearly guarded. He stated "We continued her on topical bleach twice a day and emollients applied topically as needed, and if her parethesia persisted past another three to four weeks, then I suggested she see a neurologist." Regarding the cause of the recent symptoms, he felt the onset time was later than usual but obviously attributed them to the burned skin and said:
I'm not a neurologist, but usually after an injury of this sort you can have some abnormal sensation, numbness, tingling immediately after the crust has come off, *749 and usually with the passage of time say, a month or two, it goes away.... I'm hoping it's just a matter of time for the nerve endings to regenerate into this area, but if it persisted I told her she would need to see a [neurologist]. (Emphasis ours.)
Dr. Marinello opined Ms. Ramsey's condition was attributable to her contact with cement. He stated re-exposure could cause the same condition to recur, but this could only be known after re-exposure. The doctor was asked if she could return to a job requiring repetitive kneeling and stooping, and replied:
That would have to be excluded, especially until these symptoms, her neurological symptoms she has would either be further evaluated, or until they had cleared up.
Q So at this time your recommendation is she should not do any work that would require kneeling or repetitive kneeling or stooping?
A Correct.
On cross-examination, Dr. Marinello reiterated his concern regarding the neurological symptoms. He would not recommend kneeling for prolonged periods of time. When asked whether knee pads would alleviate the situation, he stated "Well that depends on whether or not these neurological symptoms clear up. If they do and she's willing to work she could, but without [knowing] the outcome of these more recent symptoms I would say no until". At this point the doctor was cut off and asked to "assume the neurological is not connected to the accident or doesn't exist." Would the residual scarring alone prevent her from returning to work as a cement finisher if she used knee pads? He responded she could work but would still have the possible threat of a similar problem upon re-exposure. The doctor again added "Provided her neurological symptoms had cleared. Assuming all that."
Dr. Marinello felt the scarring alone would not inhibit work, but on the neurological symptoms and skin atrophy he stated:
That becomes subjective as far asthere are various degrees of atrophy, and if you're feeling or placing pressure on an area that's thin, that might become painful, and a lot would depend on the patientindividual patient how much discomfort they would have.
And later:
That's going to be something very subjective. I mean I don't know how much discomfort she's going to put up with.
* * * * * *
Q But in her condition right now you would not recommend that because of the thinness of the skin that she do prolonged stooping and bending, is that correct?
A And because of her neurological symptoms.
Q But that's coupled with the thinness of the skin?
A Correct.
Dr. Marinello said the skin condition was permanent. He also stated cement dermatitis was common and he did not usually refer patients with numbness to a neurologist, but did so because of the litigation.
Dr. Charles Billings, orthopedic surgeon, examined plaintiff on November 19, 1982 at Dr. Marinello's request. He was not questioned about the neurological symptoms, but he expressed concern about the thinness of the skin. His examination revealed that the change in the skin overlying the subcutaneous regions of the patella tendons would probably make repetitive kneeling and excessive pressure a problem in the long run. He said:
"... repetitive or prolonged kneeling activities would more likely than not produce symptoms of knee pain and possibly patella tendonitis, or inflammation of that area where the skin was abnormal."
Dr. Billings was skeptical on the use of knee pads because:
I think there should be a restriction in the absolute number of hours or minutes... there should be a restriction in the *750 number of times that this weight bearing on that region on the knee is carried out.... [The pads allow] dispersing the force over the knee joint, but still building up stress concentration over the area of the abnormal skin or subcutaneous tissue so that it should improve things, but I'm not sure that it will change the pressure build-up in the area of abnormal tissue overlying the patella tendon region.
When pressed, Dr. Billings assigned an 8% disability for the right leg and 6½% to the left leg.
At defendant's request, Dr. Monroe Laborde, orthopedic surgeon, evaluated plaintiff on March 9, 1983 and his report was stipulated. He felt plaintiff was able to kneel without difficulty and found "no objective physical impairment and no orthopedic contra-indication to working."
The diagnosis and opinion of the treating physician and that of a specialist consulted by the treating physician are entitled to greater weight than that of the physician who examined solely for the purpose of litigation. Schouest v. J. Ray McDermott & Co., 411 So.2d 1042 (La. 1982).
The trial court disregarded Dr. Marinello's concern over plaintiff's neurological symptoms. It is clear, however, that at trial Dr. Marinello considered plaintiff unable to resume her former occupation. Not only were neurological symptoms unresolved, the skin thinning was also a problem. Dr. Billings was in accord with this opinion: both agreed the skin condition was permanent and repetitive kneeling, even with knee pads, would cause pain and possibly patella tendonitis and inflammation. Plaintiff's occupation of apprentice cement finisher required daily hours of repetitive kneeling.
We are satisfied, based on the medical and lay testimony at trial, that Ms. Ramsey could not perform the same duties in which she was customarily engaged when injured, or duties of the same or similar character for which she is fitted by education, training and experience. The record does not establish that she cannot pursue some other career which does not involve stooping or kneeling. Therefore, she is partially disabled within the meaning of LSA-R.S. 23:1221(3), Orgeron, supra. The trial court correctly concluded plaintiff "was partially disabled", but erred in limiting benefits to the specific loss provisions.
The evidence does not indicate the duration of disability, so Ms. Ramsey is entitled to benefits during her disability not to exceed the maximum period allowed by law, Blazier v. Georgia-Pacific Corp., 301 So.2d 701 (La.App. 3d Cir.1974). She cannot recover benefits under both the specific loss and partial disability provisions, but should receive the more favorable of the two. Stracener v. United States Fidelity & Guaranty Co., 420 So.2d 1101 (La.1982). Plaintiff is entitled to a maximum of 66 2/3% of "the difference between the wages the employee was earning at the time of the injury and any lesser wages which the injured employee actually earns in any week thereafter ... during the period of disability... and not beyond a maximum of four hundred fifty weeks...." Ms. Ramsey was partially disabled at the time of trial and should receive benefits for the duration of her disability not to exceed 450 weeks.
The trial judge properly denied penalties and attorney's fees. It is clear that plaintiff did not notify the defendant of the medical reports which conflicted with Dr. Faust until just prior to trial.
The judgment of the district court is amended to award plaintiff partial disability benefits pursuant to LSA-R.S. 23:1221(3), beginning July 24, 1982, not to exceed 450 weeks, subject to the statutory provisions. Legal interest is due on each past due payment from its due date until paid. Medical expenses are amended to $556, and plaintiff is entitled to other medical expenses under LSA-R.S. 23:1203.
AMENDED; AFFIRMED.
NOTES
[1] The trial judge apparently applied LSA-R.S. 23:1221(4)(h), (o) and determined the proportion of wages for each extremity computed at 8% and 6½% (the disability rating assigned by Dr. Billings) would be less than the statutory minimumLSA-R.S. 23:1202$55.00 for accidents occurring within the 12 months following September 1, 1981.
[2] The judgment awards $226 for Dr. Billings but the bill is $266.