485 So.2d 83 (1986)
Mary BARRY, Plaintiff-Appellant,
v.
WESTERN ELECTRIC COMPANY, INC., Defendant-Appellee.
No. 17527-CA.
Court of Appeal of Louisiana, Second Circuit.
February 26, 1986.
Writ Denied May 1, 1986.
*84 Baggett, McCall & Ranier by Robert C. McCall, Lake Charles, for plaintiff-appellant.
Tucker, Jeter & Jackson by James C. McMichael, Jr., Shreveport, for defendant-appellee.
Before HALL, JASPER E. JONES and SEXTON, JJ.
HALL, Chief Judge.
In this worker's compensation action against defendant, Western Electric Company, Inc., now AT & T Consumer Products, a Division of AT & T Technologies, Inc., plaintiff, Mary Barry, sought benefits for an alleged permanent and total disability as a result of a work-related accident. After trial, the trial court awarded plaintiff benefits in the amount of $8,800.00 under the scheduled loss provisions, with credit for compensation previously paid, together with statutory penalties in the amount of $497.38, and reasonable attorney's fees in the amount of $1,500.00. Plaintiff appealed, and now contends she is entitled to benefits for permanent partial disability. For the following reasons, we amend the judgment of the trial court to increase the amount of attorney's fees and, as amended, affirm.
ASSIGNMENTS OF ERROR
On appeal, plaintiff-appellant asserts the following assignments of error:
1. The trial court erred in finding that plaintiff could return to her former job, specifically in giving greater weight to the "no opinion" of the treating physician rather than to the positive finding of an examining orthopedist that a return to work would lead to disabling pain;
2. The trial court erred in refusing to award payment for chiropractic treatment expenses; and,

*85 3. The trial court erred in limiting the award of attorney's fees to $1,500.00 in light of the complex nature of the case.
FACTS
Plaintiff was employed as a bench worker at the defendant's plant in Shreveport, Louisiana. Plaintiff's job was assembling coils on an assembly line and required plaintiff to complete six different work stations or stages of assembly. The position required plaintiff to solder and pull a lever among other tasks. The coils were contained in a pan and the estimates of the weight of the pan at trial ranged from 7½ to 20 pounds. On March 3, 1980, plaintiff slipped on a piece part and fell, striking her back and neck. She immediately sought medical attention at the plant and then returned to work. Plaintiff had complaints of pain in her upper extremities and continued to work and seek medical treatment for several weeks until she was hospitalized for several days and placed in traction. After plaintiff was discharged, plaintiff returned to work on a restricted schedule. Plaintiff continued to have complaints of pain and she was hospitalized again for tests in June, 1980. Her condition was eventually diagnosed as thoracic outlet syndrome and plaintiff underwent surgery for this condition in October, 1980.
Plaintiff received worker's compensation benefits for the following time periods: March 21, 1980 to April 21, 1980 and April 25, 1980 to July 15, 1980. Plaintiff was cleared to return to work on July 15, 1980 by the company physician and benefits were terminated by defendant as of that date despite plaintiff's assertions that her treating physician had not cleared her to return to work. When plaintiff refused to return to work until released by her treating physician, her employment was terminated.
Plaintiff instituted this action for worker's compensation benefits, statutory penalties, and attorney's fees on September 11, 1980, alleging that she was permanently and totally disabled as a result of the work related accident.
At the trial on the merits, numerous physicians and lay witnesses testified regarding the injury to and medical treatment of plaintiff, which testimony is summarized as follows.
Plaintiff, Mary Barry, testified that she was employed as a bench worker assembling coils on an assembly line at the defendant's plant. The position entailed six different work stations or stages of assembly with the worker being seated on a chair, working on a table. Plaintiff testified that she was required to pick up and move a pan of approximately 100-200 loose coils through the various stages. Plaintiff estimated that the pan weighed approximately fifteen to twenty pounds and that on an average day she worked with 400 to 700 coils. Plaintiff testified that the work required her to bend her head over and to extend her arms away from her body. Plaintiff testified that on the date of the accident, she stepped on a part on the floor and slipped. Plaintiff tried to regain her balance by grabbing at things for support but was unable to break her fall. In falling, plaintiff stated she hit the upper part of her back and lower neck. Plaintiff sought medical treatment approximately ten minutes after the fall at the plant's medical facilities. The company physician, Dr. Van Hook, applied an ice pack on plaintiff's neck and plaintiff then returned to work. Plaintiff stated that her shoulder hurt and it felt as if something had been knocked out of place. Plaintiff continued to work for three weeks following the accident and continued to receive medical treatment at the plant.
Plaintiff then consulted her family doctor and was put in the hospital for 3 to 4 days for traction. Plaintiff later returned to work on a restricted half-day schedule for several weeks. Plaintiff stated that at that time her hands were getting numb and she could not hold them up without support. Plaintiff was referred to Dr. Faludi who admitted her into the hospital in June, 1980 for tests and a myelogram. While in the *86 hospital, plaintiff was apparently referred to Dr. Hernandez by Dr. Faludi. Dr. Faludi released plaintiff to return to work on July 1, 1980. However, plaintiff was advised by her physician, Dr. Hernandez, to wait before returning to work after her release from the hospital. Plaintiff testified that she kept the defendant fully notified of her condition. On July 15, 1980, plaintiff was asked to report at the plant and meet with Dr. Van Hook. Dr. Van Hook told plaintiff to return to work although plaintiff insisted she would not as she had not been released to do so by her own physician.
Plaintiff testified she continued to have pain in her shoulders and arms until her condition was eventually diagnosed as thoracic outlet syndrome. In October, 1980, plaintiff was again hospitalized and underwent surgery for thoracic outlet syndrome. Plaintiff stated that the surgery helped her condition but did not fully clear it up. Before and after the surgery, plaintiff was able to do some part-time secretarial work.
On June 19, 1981, plaintiff was involved in an automobile accident but testified that it only made her feel sore and the problems caused by the accident seemed to quickly resolve themselves. Plaintiff testified that she had not been completely pain free following the work-related accident although she did have periods of feeling better. Plaintiff testified that as she was not getting better, she eventually consulted with a chiropractor. Plaintiff painted as a hobby and testified she had begun to enjoy some commercial success as an artist. Plaintiff testified she was doing oil paintings before the accident but found it difficult to do so afterwards as it required her to extend her arms. Plaintiff now does "egg painting" using egg tempra paint. Plaintiff testified her hands were very shaky and hard to hold still and that she cannot sit for extended lengths of time and paint. Plaintiff stated that she did not feel that she could return to the duties of her former employment.
Roger Jones, a co-worker of plaintiff's, testified that he witnessed the plaintiff's accident. Jones testified that plaintiff was not able to fully return to work following the accident and that plaintiff complained of pain. Jones testified that plaintiff's job required her to work with her arms extended and to look down quite a bit as well as transporting the pans with coils. Jones estimated that the pans weighed approximately fifteen to twenty pounds.
Bruno Barry, plaintiff's husband, testified that the accident had restricted plaintiff's activities and affected plaintiff's ability to paint. Barry stated that he had been doing most of the household chores as plaintiff could not lift anything. Barry testified that plaintiff had improved before the automobile accident but he did not think she was pain free at that time. Barry stated that the automobile accident did aggravate the plaintiff's condition for some period of time.
Dr. Victor Hernandez, a general, thoracic and vascular surgeon, testified on behalf of the plaintiff. Hernandez testified he first saw plaintiff in June, 1980 in the hospital as a consultation with Dr. Faludi. Plaintiff was complaining of pain in both sides of the posterior aspect of the neck with pain radiating into both shoulders and arms. Hernandez conducted a physical examination and stated the physical findings confirmed the presence of pain. Hernandez's initial impression at that time was possible severe musculoligamentous strain of the cervical spine with the possibility of thoracic outlet syndrome. While in the hospital, plaintiff had a cervical myelogram which ruled out the possibility of root involvement at the level of the cervical spine. Hernandez stated that after this, he strongly suspected that most of the problem was thoracic outlet syndrome. Hernandez explained that the syndrome is essentially the compression of three types of anatomical structures between the first rib and clavicle near the side. The symptoms vary depending upon which structure is compressed. Hernandez's diagnosis when plaintiff was discharged from the hospital was severe muscular ligamentous strain of the cervical spine with the possibility of the *87 beginning of thoracic outlet syndrome. Hernandez stated that most of the patients start with severe muscular spasms of the neck and shoulder and eventually develop the syndrome. Hernandez testified that one of the mechanisms of the development of thoracic outlet syndrome is any type of trauma to the neck and shoulders and that it was more likely than not that plaintiff's condition was related to the fall.
Following plaintiff's discharge, Hernandez was plaintiff's primary treating physician. Hernandez saw the plaintiff on July 24, 1980 and August 21, 1980. Hernandez stated that plaintiff was improving with the treatment of physical therapy and muscle relaxants but was still complaining of pain and some numbness of the hands. Plaintiff was next seen by Hernandez on September 18, 1980 and had essentially the same complaints of pain. Plaintiff was referred to Dr. Crusen at Baylor University for conduction studies, which studies indicated bilateral thoracic outlet syndrome, more symptomatic on the right side.
Hernandez testified he next saw the plaintiff on October 9, 1980 and her symptoms had become more severe despite conservative treatment, namely the medication and exercises designed to relax the musculature of the neck and shoulders and to open up the thoracic outlet. Hernandez stated that he believed plaintiff had developed a definite thoracic outlet syndrome on the right side. Plaintiff had surgery for this condition on October 27, 1980 which involved the resection of the first right rib. Hernandez felt plaintiff had a good relief of symptoms, although plaintiff was not completely symptom free. Plaintiff complained intermittently of pain and numbness of the upper extremities particularly when she performed excessive physical work or attempted to lift anything heavy. Hernandez testified that he periodically furnished medical reports to the defendant. Hernandez saw plaintiff in his office on November 10, 1980 and she was making satisfactory progress from the surgery. Plaintiff complained of pain which Hernandez told her was mainly due to the surgical procedure. Hernandez next saw the plaintiff on December 11, 1980, and she was almost completely asymptomatic at that time. Plaintiff was still having a little pain in the posterior aspect of the neck whenever she exercised. At that time, Hernandez felt that plaintiff was able to resume some sort of employment.
Hernandez next saw the plaintiff on April 2, 1981 and she was almost completely asymptomatic except for some pain in the shoulders. Hernandez saw the plaintiff on June 2, 1981 and at that time plaintiff complained of a tingling sensation in both sides of the neck and in the right shoulder. Hernandez's examination found no evidence of a neurological deficit and the x-rays disclosed no regeneration of the drift. Plaintiff was advised to resume the thoracic outlet exercises.
Hernandez saw plaintiff following the automobile accident and stated that it had aggravated some of her symptoms. Hernandez saw plaintiff on four occasions following the accident with the last visit on August 19, 1982. During these visits, plaintiff complained of pain, weakness in the left hand, and a tingling sensation in the right shoulder and elbow.
Hernandez assigned plaintiff a fifteen percent disability in the right upper extremity. Hernandez testified that thoracic outlet syndrome is a difficult problem and even simple tasks such as writing, painting, or grasping with the hand will give the patient problems. Hernandez testified that as of January 15,1982, he felt that plaintiff could possibly go back to do some type of work, gradually increasing any strenuous physical exercise. Hernandez stated that his main objection at that time was for plaintiff to do any lifting of heavy objects above shoulder level. Hernandez stated that he liked patients to start on a very light work schedule and gradually increase it until the patients could go back to any type of work, if possible.
Dr. James Wiseman, a chiropractor, testified he first saw the plaintiff on February 8, 1983 at which time plaintiff complained of chronic episodes of pain, her fingers *88 falling to sleep on both hands and a sticking feeling in between her shoulders upon certain movements. Wiseman performed a physical examination and an x-ray examination. The physical examination revealed a diminished biceps reflex on both sides, congested upper thoracic musculature and complaints of pain. Wiseman's diagnosis was thoracic outlet syndrome with radiculitis, bilateral brachial neuralgia and paresthesia. Wiseman explained that radiculitis is considered nerve root pain and brachial neuralgia and paresthesia is pain and numbness which extends down in the arms and hands.
Wiseman treated plaintiff for approximately 5 to 6 months using standard adjunctive procedures, physical therapy, traction, and chiropractic manipulative treatment. Wiseman testified that plaintiff's symptoms did improve with treatments. Wiseman stated that during the course of treatment, plaintiff would be pain free at times and then would have flare-ups of pain which was consistent with thoracic outlet syndrome. Wiseman had a thermogram, a very sensitive heat-taking picture, performed on the plaintiff which is an objective test. Plaintiff's thermogram revealed nerve fiber irritation at various cervical vertebra. The findings were diminished heat patterns which generally indicate a chronic type nerve irritation over a long period of time. Wiseman saw plaintiff approximately 40 times, with the last visit being on August 9, 1983. Wiseman testified that he thought there was a very strong chance that plaintiff would continue to have problems. Wiseman stated that the treatments rendered by him were necessary and beneficial and that it was a condition that he could treat very effectively.
Dr. Norman Morin, an orthopedic surgeon, testified by deposition that he saw plaintiff on one occasion on July 7, 1983. Plaintiff complained of intermittent burning pain over both shoulder blades with radiation down into the arms and hands on occasion. Lifting and using the upper extremities aggravated plaintiff's pain and the plaintiff experienced a sticking sensation in the base of the neck. Morin performed a routine orthopedic examination and took x-rays. Morin found cervical muscle spasms which were a definite indication of pain and tenderness in the cervical area. Range of motion tests produced complaints of pain from the plaintiff which were consistent with the findings of muscle spasms. From his examination, Morin concluded that plaintiff had suffered a 10 percent partial permanent disability to the body as a whole as a result of the injury and that plaintiff would experience disabling pain if required to lift 5 to 10 pounds or more at work on a daily basis or if required to work with her arms extended. Morin testified that he did not find any evidence of thoracic outlet syndrome when he examined plaintiff and that it appeared that the surgery may well have been successful. Morin's opinion of plaintiff's condition was that the injury, which was a myofascial strain, had aggravated a pre-existing degenerative condition in the plaintiff's neck.
Ed Tuberville, supervisor of the defendant's benefit service organization, testified that he was involved with the payment of worker's compensation benefits. Tuberville testified that the payments of benefits are based on medical information, both from the defendant's medical department and various treating physicians. Tuberville stated that the defendant terminated the plaintiff's benefits as of July 15, 1980 based on a medical decision by Dr. Van Hook that plaintiff could return to work on that date and other medical reports on file. Plaintiff was also considered to have been terminated when she failed to return to work on that date. Tuberville testified that the defendant was aware in mid-July that Dr. Hernandez was the plaintiff's primary treating physician and that the defendant did not accept responsibility for plaintiff's thoracic outlet syndrome. Tuberville testified that he had in the past supervised plaintiff in her work as a bench worker. Tuberville stated that the bench worker position allows some freedom of movement. The worker could either sit or stand and the job did not require the worker's *89 head to remain fixed in the same position for a long period of time. Tuberville stated that the work table is approximately 3 feet high and that in some areas, the pans could be slid rather than picked up by the employee.
Dr. Patty Van Hook, an occupational medicine specialist with the defendant's medical department, testified she saw the plaintiff on the day of the accident. Plaintiff related that she had fallen and had neck pain on the left side. Van Hook stated that plaintiff received conservative treatment. Van Hook saw plaintiff again on March 5, 1980 at which time plaintiff's neck was stiff. Plaintiff was referred to an orthopedic surgeon, Dr. Mead, at that time and given a muscle relaxer. The report from Dr. Mead stated plaintiff had acute cervical strain which was gradually resolving. Plaintiff reported to the medical department on March 10, March 11, and March 13, 1980. Plaintiff complained of pain in her neck and shoulders which was radiating in her lower back and both legs. Plaintiff also complained that it was aggravating to hold her head down so a nurse was sent to observe plaintiff's work station to see if alterations could be made. Plaintiff's chair was adjusted and the nurse found that plaintiff did not have to hold her head down constantly.
Plaintiff was next seen by Van Hook on March 17, 1980 and March 19, 1980. Plaintiff's condition was improving at that time. Van Hook saw plaintiff next on April 14, 1980 and plaintiff complained of pain in the neck and in both arms, radiating down into her hands. Van Hook monitored plaintiff's treatment by Dr. Faludi who communicated that plaintiff's problem was degenerative disc disease of the cervical spine and that plaintiff should be able to return to work by July 1, 1980. This report was received by Van Hook on July 8, 1980. Plaintiff was contacted and reported to Van Hook on July 15, 1980 at which time plaintiff complained of problems with both of her arms and finger numbness. Van Hook attempted to contact Dr. Hernandez and was told he was out of town. Van Hook stated that Hernandez's nurse reported that plaintiff had been asymptomatic upon her discharge from the hospital and was doing well on July 3, 1980. Van Hook stated she then cleared plaintiff to return to work with a work restriction. Other than plaintiff's insistence that Hernandez had not cleared her to return to work, Van Hook stated she did not have any information that conflicted with the reports that plaintiff could return to the job.
Van Hook testified she contacted Hernandez on September 29, 1980, who agreed with her decision to return plaintiff to work on a restricted schedule. Hernandez indicated to Van Hook that plaintiff's pain had increased and that he was sending plaintiff for repeat nerve conduction studies. Van Hook testified that Hernandez sent medical reports to the medical department updating them on the plaintiff's condition during the course of his treatment of the plaintiff. Based upon Van Hook's observation of the job requirements of a bench worker, Van Hook stated that the restrictions suggested for plaintiff by Hernandez would not prevent plaintiff from doing the job without limitations. Van Hook testified that in her opinion chiropractic treatment was not necessary for the plaintiff.
TRIAL COURT DECISION
After reviewing the evidence, the trial court found that plaintiff failed to prove her inability to perform her job as a bench worker. The trial court noted that plaintiff's job did not require her to lift heavy objects above shoulder level, which action the physicians agreed plaintiff should avoid. The court gave great weight to the inability of Dr. Hernandez to declare that plaintiff could not perform bench work and to his opinion that the only method to make a definitive determination of plaintiff's abilities was for plaintiff to attempt to try the job again. Although Dr. Morin testified plaintiff could not perform the work, the court found that the testimony of the treating physician should be given more weight than that of a physician who examined plaintiff solely for diagnostic purposes. The court further found that plaintiff's *90 ability to continue her art work was another factor indicative of her lack of disability as it suggested that she was able to do work of a nature similar to her former job since both tasks require plaintiff to remain seated and extend her arms for periods of time. However, the court found that plaintiff's benefits were terminated prematurely as plaintiff was not yet discharged by Dr. Hernandez when her compensation benefits were terminated in July, 1980. The court found that plaintiff was medically discharged by Hernandez in a letter to defendant dated January 23, 1981 and it was at this time that the plaintiff's benefits should properly have been terminated.
As plaintiff was entitled to recover benefits for temporary total disability and for a specific loss, the court awarded the greater amount of compensation under the scheduled loss provisions, $8,800.00, with a credit to defendant in the amount of $2,235.70 representing compensation benefits already paid to plaintiff. The court refused payment for chiropractic treatments, finding that the plaintiff failed to show such treatments were necessary or beneficial. The court further found that the defendant had not made a reasonable effort to ascertain plaintiff's medical condition before terminating benefits and awarded statutory penalties calculated on the amount of benefits due for the additional 28 week period of disability in the amount of $497.38, together with reasonable attorney's fees in the amount of $1,500.00.
APPLICABLE LEGAL PRINCIPLES
This case is governed by the provisions of the Worker's Compensation Act in effect on March 3, 1980, the date of the accident.
The finding of disability within the framework of the worker's compensation law is a legal rather than purely a medical determination. Calhoun v. Fireman's Fund Ins. Companies, 437 So.2d 900 (La.App. 2d Cir.1983). The provisions of the compensation statute are to be construed liberally in favor of the claimants. Glover v. Southern Pipe & Supply Co., 408 So.2d 352 (La.App. 4th Cir.1981), writ denied, 412 So.2d 86 (La.1982). An injured employee is partially disabled if she is unable to perform the duties in which she was customarily engaged when injured or duties of the same or similar character for which she is fitted by training, education, or experience. The worker is also partially disabled if there is substantial pain when engaging in her former occupation, even though that worker can work in other types of jobs without pain. LSA-R.S. 23:1221(3); Martin v. H.B. Zachry Co., 424 So.2d 1002 (La.1982); Simpson v. S.S. Kresge Co., 389 So.2d 65 (La.1980); Reynolds v. Wal Mart Stores, Inc., 445 So.2d 490 (La.App. 2d Cir.1984); Attaway v. Farley's Glass Co., Inc., 430 So.2d 705 (La. App. 2d Cir.1983); Scott v. Sears, Roebuck & Co., 406 So.2d 701 (La.App. 2d Cir.1981); Harrington v. Starline, Inc., 425 So.2d 307 (La.App. 3d Cir.1982); Carter v. Pitt Grill, Inc., 425 So.2d 375 (La.App. 3d Cir. 1982); Ramsey v. Dragon Ltd., 448 So.2d 745 (La.App. 4th Cir.1984); Martin v. Orleans Parish School Bd., 427 So.2d 83 (La. App. 4th Cir.1983), and citations therein.
The claimant bears the burden of proving to a legal certainty and by a reasonable preponderance of the evidence the nature and the extent of her disability. Campbell v. Luke Const. Co., 465 So.2d 688 (La. 1985); Harrison v. Chicago Mill & Lumber Co., 446 So.2d 843 (La.App. 2d Cir. 1984); Attaway v. Farley's Glass Co., Inc., supra; Latiolais v. Home Ins. Co., 454 So.2d 902 (La.App. 3d Cir.1984), writ denied, 460 So.2d 610 (La.1984); Thomas v. Gregory & Cook, Inc., 445 So.2d 1258 (La. App. 3d Cir.1984); Martin v. Orleans Parish School Bd., supra, and citations therein. In a compensation action, the trial court has the responsibility of determining whether the claimant is disabled. Johnson v. Ins. Co. of N. America, 454 So.2d 1113 (La.1984). In each particular case, the totality of the evidence, both medical and lay testimony, must be examined by the trial court in making its determination on the question of disability and it is the function of the trial court to assess the weight to be accorded to such testimony. Simpson v. S.S. Kresge Co., supra; Harrison v. Chicago *91 Mill & Lumber Co., supra; Martin v. Emerson Elec. Co., 437 So.2d 910 (La.App. 2d Cir.1983); Attaway v. Farley's Glass Co., Inc., supra; Henson v. Handee Corp., 421 So.2d 1134 (La.App. 2d Cir.1982); Westley v. Pressure Services, Inc., 452 So.2d 354 (La.App. 1st Cir.1984); Latiolais v. Home Ins. Co., supra; Thomas v. Gregory & Cook, Inc., supra; Guerrero v. Tico, 436 So.2d 1237 (La.App. 5th Cir.1983), and citations therein.
It is well settled that disability is a question of fact and due to the trial court's better capacity to evaluate live witnesses, the factual findings of the trial court as to a work-related disability are afforded great weight on appellate review, particularly those which involve a determination of the credibility of the witnesses, and will not be disturbed unless clearly wrong. See Johnson v. Ins. Co. of N. America, supra; Culp v. Belden Corp., 432 So.2d 847 (La.1983); Martin v. H.B. Zachry Co., supra; Simpson v. S.S. Kresge Co., supra; Crump v. Hartford Acc. & Indem. Co., 367 So.2d 300 (La.1979); Carter v. P.K. Smith Chevrolet-Olds, Inc., 438 So.2d 655 (La.App.2d Cir. 1983), writ denied, 443 So.2d 595 (La.1983); Henson v. Handee Corp., supra; Scott v. Sears, Roebuck & Co., supra; Westley v. Pressure Services, Inc., supra; Latiolais v. Home Ins. Co., supra; Carter v. Pitt Grill Inc., supra; Harrington v. Starline, Inc., supra; Martin v. Orleans Parish School Bd., supra; Guerrero v. Tico, supra, and numerous citations therein.
With regard to medical testimony, the opinion of a physician or other medical expert does not necessarily determine a legal disability, Johnson v. Ins. Co. of N. America, supra, and the trial court may either accept or reject the opinion expressed by a medical expert depending upon what impression the qualifications, credibility, and the testimony of that expert makes on the court, Westley v. Pressure Services, Inc., supra. As a general rule, the testimony of the treating physician should be given more weight than that of a physician who examines a claimant for diagnostic purposes. See Martin v. Emerson Elec. Co., supra and Ramsey v. Dragon Ltd., supra. Further, the positive findings of medical experts are to be afforded greater weight than the negative findings as to the existence or not of a particular condition. See Campbell v. Luke Const. Co., supra.
PLAINTIFF'S DISABILITY
As noted earlier, the claimant has the burden of proving a disability by a preponderance of the evidence. The evidence presented at trial does not support a finding that plaintiff continued to be unable to perform the same work or work of a similar nature to that which she was performing at the time of the accident either because of physical inability or disabling pain beyond the period for which she has been awarded compensation. It was established that plaintiff's job allowed some freedom of movement and required her either to slide or pick up a pan of coils to transport them through the various work stations. It does not appear that the job required any particularly strenuous activity. The medical evidence indicated that plaintiff's only work restriction was the lifting of heavy objects above shoulder level, which according to the testimony was not a function required at the plaintiff's job. Although plaintiff made no effort to return to the same or similar work as she was doing prior to the accident, plaintiff was able to do secretarial work and has continued to paint on a commercial basis following the accident. Plaintiff's ability to perform these tasks, such as typing and painting, indicates plaintiff is able to return to the sedentary type of work she was performing at the time that she was injured. These tasks require physical functions similar to those required at plaintiff's former job.
Plaintiff argues that the trial court erred in finding that the plaintiff could return to her former job based upon giving greater weight to the "no opinion" of the treating physician rather than the positive finding of the examining orthopedist that a return to her former job would lead to disabling *92 pain. The inability and unwillingness of the plaintiff's primary treating physician to reach a definitive conclusion that she could not return to work weighs heavily against plaintiff's claim of permanent and partial disability. Hernandez essentially testified that the only way to make a determination would be to have plaintiff return to work on a light schedule and gradually increase her activities. Although Dr. Morin testified that plaintiff was disabled from returning to her former position, it appears that Morin examined plaintiff only once and then solely for the purpose of testifying at trial, which fact justifies the trial court affording greater weight to the testimony of Hernandez.
In summary, based upon the evidence, the trial court did not err in finding that the plaintiff failed to meet her burden of proving her claim of permanent partial disability.
CHIROPRACTIC EXPENSES
Plaintiff argues that the trial court erred in refusing to award payment for the chiropractic treatment expenses as plaintiff was entitled to seek treatment for the relief of pain. The chiropractor's charges were $2,453.00 for 40 treatments over a 5 to 6 month period.
Pursuant to LSA-R.S. 23:1203, the defendant is required to pay for all necessary medical, surgical, and hospital services, plus medications and any other non-medical treatment recognized by this state as legal, such as chiropractic, incurred by the claimant. See Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65 (La.1983) and Martin v. H.B. Zachry Co., supra. This includes treatment, medical and non-medical, which will serve to cure the disability as well as such treatment as is necessary to relieve the pain which the claimant suffers as a result of the disability. See Gourdon v. Rockwood Ins. Co., 368 So.2d 1156 (La.App. 3d Cir.1979).
The evidence reveals that plaintiff began her course of chiropractic treatment in February, 1983, almost three years after the on-the-job accident and approximately six months after plaintiff's last visit with Dr. Hernandez on August 19,1982 when he released her after finding no further treatments were necessary. While plaintiff is entitled to such treatment, medical and non-medical, as is necessary to relieve pain, in order to recover expenses for such treatments, plaintiff has the burden of proving that such treatments were necessary and causally related to the work-connected injury.
Plaintiff had been released by her treating physician, who apparently found no further medical treatment was necessary, before she began her chiropractic treatments. Plaintiff was essentially asymptomatic at that time. Dr. Morin, who examined plaintiff in 1983, was of the opinion that the thoracic outlet syndrome surgery was successful and attributed plaintiff's continuing complaints to her degenerative disc disease aggravated by a strain, a diagnosis never made by plaintiff's treating physician during the course of her treatment for the on-the-job injury. The testimony of the plaintiff and the chiropractor at trial did not establish that the course of treatments were causally related to the injuries sustained by plaintiff in the work-related accident and such a conclusion is not supported by the medical evidence. Further, the testimony of Dr. Hernandez indicated that the chiropractic treatments were in fact unnecessary. Considering the record as a whole, it does not appear that the trial court was clearly wrong in refusing to award these expenses.
ATTORNEY'S FEES
Plaintiff argues that the trial court erred in awarding $1,500.00 in attorney's fees which was an inadequate amount for more than fifty hours of work at trial.
It is well settled that great discretion is afforded to the trial court in determining the amount of attorney's fees. See Reynolds v. Wal Mart Stores, Inc., supra and Scott v. Sears, Roebuck & Co., supra.
A review of the record evidences a considerable amount of work on the part of the plaintiff's trial counsel supporting the *93 time estimate of more than fifty hours. The trial on the merits was quite lengthy with testimony by numerous witnesses and obviously required a great deal of pre-trial preparation. Given these facts, it appears that the trial court abused its discretion in awarding only $1,500.00 as attorney's fees. This court finds that an award of $3,000.00 in attorney's fees would be more appropriate.
JUDGMENT
For these reasons, the judgment of the trial court in favor of plaintiff, Mary Barry, and against defendant, Western Electric Company, Inc., now AT & T Consumer Products, A Division of AT & T Technologies, Inc., is amended so as to increase the award for attorney's fees to $3,000.00 and in all other respects is affirmed. Costs of this appeal are assessed equally to plaintiff and defendant.