MARVIN, Judge.
In this worker’s compensation action, Ms. Reynolds appeals the rejection of her demands for total permanent disability benefits, medical and travel expenses, and penalties and attorney fees. She contends defendant arbitrarily terminated her benefits some 15 months after she sustained a disabling accident and five months after a later off-the-job accident that caused her an unrelated disability.
The extent of plaintiffs disability 15 months after her accident is a factual issue best resolved by the trier of fact. We find the trial court’s determination is not clearly wrong and affirm.
PACTS
Nelda Reynolds worked as a security guard for defendant. On the night of January 3, 1986, while making her rounds at a highway construction site in rural DeSoto Parish, she slipped on wet gravel causing the right side of her body to slide into a bulldozer. The next day, she saw her family doctor, Dr. Huckabay, and complained of pain in her back and right hip. Over the next few weeks, Dr. Huckabay saw her several times and gave her injections of pain medicine and muscle relaxants.
Ms. Reynolds saw her orthopedic surgeon, Dr. Zum Brunnen, on January 22, 1986. He had been treating her conservatively for recurring back pain since 1983, when he diagnosed mild degenerative disc disease in her lower back. Before the January slip and fall, Ms. Reynolds occasionally complained of pain in her right leg but more often of pain in her left leg. After the fall, she had more pain in her right leg than in her left. Dr. Zum Brunnen associated these leg pains with her disc disease. In his opinion, the January 3 fall aggravated her pre-existing condition and caused her pain to increase. He said it was not unusual for the leg pain to shift from one side of the body to the other. He did not consider her a candidate for back surgery because she does not have any neurological deficit or muscle weakness to warrant taking the serious risks that would be presented by surgery on someone her size, 5'6" and about 300 pounds, and her age. She was 34 years old in January 1986.
Dr. Zum Brunnen first noted swelling of Ms. Reynolds’ right knee on April 30, 1986. He took X rays that showed moderately severe arthritis in the knee joint. He performed an arthroscopy, or surgical examination of the right knee, on May 20, 1986. He found that her arthritis was more severe than the X rays indicated and removed some degenerated tissue from her knee. About two months later, he found no knee or leg swelling and believed her knee had improved as much as could be expected after arthroscopy. In his opinion, her slip and fall aggravated the arthritic condition of her knee to the extent that she needed the surgery, but he noted that she responded well to the surgery. He doubted that her knee will ever be totally asymptomatic but attributed this to her severe arthritis coupled with her obesity, and not to the fall. He associated her pre-surgical right-leg swelling with the fall but attributed the swelling she was having in late 1987 to nonuse of the leg.
After her fall in January 1986, Ms. Reynolds returned to work for a few days. She continued to work at her second job, as a school bus driver for the DeSoto Parish School Board, until October 15, 1986, when she fell in a hole outside the VFW hall in Mansfield. This fall tore some ligaments in her left ankle and dislocated her right elbow.
Personnel records from the school board show that Ms. Reynolds took 15-20 days of sick leave per month from November 1986 until her employment was terminated in April 1987. Between the January accident and the VFW October accident, she averaged taking about five sick days per month, only slightly more than her 4V2 day average from September 1984 through December 1985.
*1042 Dr. Huckabay first saw Ms. Reynolds in August 1984. She was having headaches associated with a tumor under a tooth. Dr. Huckabay gave her pain medicine for relief until another doctor performed surgery a few days later. Dr. Huckabay saw her with complaints of neck, leg and back pain after an automobile accident on March 27, 1985. Other conditions for which he treated her in 1985 included leg cramps, hemorrhoids, an ovarian cyst, and respiratory and throat infections.
On January 3,1986, before Ms. Reynolds slipped and fell at work, she had seen Dr. Huckabay with complaints of shoulder pain and headaches. This was her 195th visit to Dr. Huckabay since August 1984, an 18-month period. By the time Dr. Huckabay’s deposition was taken in late 1987, almost two years after the accident, he had seen Ms. Reynolds 295 more times, a total of 490 visits during a period of about 40 months.
Before the January 1986 accident, Dr. Huckabay gave Ms. Reynolds frequent injections of pain relievers and muscle relaxants for her “general overall incapacitating pain.” These injections continued throughout 1986 and 1987 and caused chronic abscesses of her left buttocks.
Dr. Zum Brunnen first saw Ms. Reynolds in 1978. He operated on her left wrist in 1979 and again in 1983 for carpal tunnel syndrome, resulting from an on-the-job injury. See Reynolds v. Wal Mart Stores, Inc., 445 So.2d 490 (La.App. 2d Cir.1984). Dr. Zum Brunnen saw her with complaints of back pain about twice a year in 1983 and 1984, and six times in 1985 after a March 1985 car accident. Both before and after the January 1986 fall, he prescribed pain pills, muscle relaxants and tranquilizers for her to take at home. Drs. Huckabay and Zum Brunnen communicated with each other throughout her treatment and agreed that Dr. Huckabay would only give her injections when the medicine prescribed by Dr. Zum Brunnen was not helping.
Defendant’s worker’s compensation insurer paid temporary total disability benefits from January 7, 1986, through March 23, 1987, totaling about $6,500. It also paid about $16,000 in medical expenses. Linda Hullett, the insurer’s claims adjuster, knew Ms. Reynolds was driving the school bus after the Bums fall and planned to reduce her benefits to supplemental earnings benefits, but never received from Ms. Reynolds the information that would show how much she was earning from the school board.
Ms. Hullett also knew Ms. Reynolds was injured again in October 1986 but was not aware of her extensive medical history before the January fall. Ms. Hullett learned this when she spoke to Dr. Huckabay in February 1987. She testified that Dr. Huckabay told her “he wanted to send me a copy of her complete medical history ... of all [her] problems, pre-existing and what was related to this injury” but could not do so without a medical release from Ms. Reynolds. Ms. Hullett asked Ms. Reynolds to sign an authorization and she refused. Ms. Hullett testified that Dr. Huckabay told her he could not say how many of Ms. Reynolds’ complaints were or were not related to the January 1986 fall.
Ms. Hullett scheduled an independent medical examination of Ms. Reynolds with Dr. Joffrion, an orthopedic surgeon. Ms. Reynolds first refused the exam and then agreed to it. Dr. Joffrion saw her on February 4, 1987. She described her injuries from the January and October falls but did not mention her back or knee problems before January 1986. Dr. Joffrion’s objective findings were essentially the same as Dr. Zum Brunnen’s — degenerative changes in the low back and right knee.
In his report, Dr. Joffrion characterized his examination of Ms. Reynolds as “exceedingly difficult” because she complained of pain with each maneuver or manipulation of her right knee and her back. Because of this difficulty, Dr. Joffrion acknowledged he might have “missed” something that he would ordinarily have diagnosed. In the absence of more definitive physical findings, he saw “no contraindications to returning to such an occupation as being a security guard.” He expressed concern about the massive amounts of sedatives and analgesics being prescribed for her.
*1043 Ms. Hullett sent a copy of Dr. Joffrion’s report to Drs. Huckabay and Zum Brun-nen, requesting their opinions about her condition and her employability. When neither had responded a month later, Ms. Reynolds’ benefits were terminated. Several weeks later, Dr. Zum Brunnen wrote to Ms. Hullett with his comments on Dr. Joffrion’s report. He shared the concern over the amount of medication Ms. Reynolds was taking but said he was “at a loss” to improve his management of her situation. He “hoped” for, but could not say when to expect, an increase in her functional capacity. He did not otherwise comment on her employability.
Dr. Huckabay did not respond to Ms. Hullett’s request. In his deposition he disagreed with Dr. Joffrion’s opinion that Ms. Reynolds could return to work as a security guard. In his opinion, she could not work without “frequent absenteeism due to pain.” He considered her disabled and unemployable based on her “poor overall health,” including her obesity, hypertension, and her back and hip injuries from the January fall. He could not say whether she would be employable if any one of these factors were removed from the analysis. He did not take into account her functional limitations from the October injuries.
Dr. Huckabay considered Ms. Reynolds unemployable as early as August 1985, when he reluctantly approved her to work for the school board for the 1985-1986 school year. He candidly said he was surprised that defendant had hired her in the first place, in late 1985. He knew she disagreed with his opinion that she was disabled because she continued to drive the school bus after he expressed reservations about her doing so in August 1985, before she began working for defendant. Dr. Huckabay deferred to Dr. Zum Brunnen’s opinion about Ms. Reynolds’ physical limitations from the January fall.
In Dr. Zum Brunnen’s opinion, the symptoms from the January and October accidents were not related but were “identifiable problems and separate from one another.” He felt Ms. Reynolds could not drive the school bus any longer because her injury from the October fall prevented her from straightening her elbow enough to open the bus door. He said she might be able to drive the bus if not for the elbow injury. In light of the fact that she drove the bus between January and October 1986, Dr. Zum Brunnen opined that the October accident was the accident that made her unemployable as a school bus driver.
Considering only the back and right leg problems from the January injury, including recurring leg swelling, and excluding the later elbow injury, Dr. Zum Brunnen did not feel Ms. Reynolds could return to work as a security guard but said she could do “sedentary type clerical work” with these restrictions: no heavy lifting or repetitive stooping, bending and twisting; no climbing; alternating periods of sitting and standing every two hours or so.
Ms. Reynolds had done clerical work in her past jobs as data processor, Census Bureau worker, admit clerk and relief switchboard operator at a local hospital, and cashier, department manager and customer service manager at Wal-Mart.
Diana Herbst, a vocational rehabilitation expert called by defendant, reviewed Ms. Reynolds’ work history and other testimony in her depositions taken in this case and in her lawsuit against the VFW. She also reviewed the depositions of Drs. Zum Brun-nen and Joffrion but apparently neither she nor defendant’s attorney had a copy of Dr. Huckabay’s deposition before trial.
Ms. Herbst contacted banks, hospitals, restaurants and other businesses in Mansfield, where Ms. Reynolds lives, and in Coushatta and Natchitoches, less than an hour’s commute from Mansfield each way. She inquired about job availability and salary for someone with the physical restrictions imposed by Dr. Zum Brunnen. She did not ask about security guard work but limited her inquiry to data processing, cashier, file clerk, or admitting clerk positions.
Although some of the positions described by the various employers entailed physical requirements beyond Ms. Reynolds’ capabilities according to Dr. Zum Brunnen, many did not. Pay for jobs that did not *1044 exceed the physical limitations ranged from $3.35 to $6.00 per hour, with most paying about $4.00 per hour. Ms. Reynolds’ temporary total disability benefits were calculated based on an average weekly wage of $160. This apparently is based on $4.00 per hour for a 40-hour week.
Ms. Herbst opined that jobs exist locally for someone with Ms. Reynolds’ education and employment background and with the functional limitations described in the medical depositions she read.
Having done clerical or sedentary work before, Ms. Reynolds denied that she could perform those duties in her present condition. She explained that she continued to drive the school bus after the January fall but did so in pain and only because she owned the bus and had to have some income with which to pay the monthly expenses for it. She said she could not drive a car except in case of emergency after January 3, 1986.
Ms. Reynolds admitted that on the day of her VFW, October 1986, injury, she drove her car to pick up her friend at work, followed her friend home for a short stop, and then drove herself and her friend to dinner and to the VFW hall, where they arrived around 10:00 p.m. to attend a party.
Ms. Reynolds testified she has been unable to do any housework since the January fall and has been greatly limited in other activities she used to perform, such as community service work and attending school functions with her teenage daughter.
In a separate lawsuit arising out of the VFW fall, Ms. Reynolds alleged that she “was an active 35 year old female and had to curtail her activities to practically nothing since the [October 1986] injury.... Since the [October] injury ... she has been unable to perform [her] duties ... as mother, housewife, cook, mate, friend, laborer, etc.” for her husband and her daughter. When asked about these allegations in relation to the time when her disability began, she said those allegations “are true” from the date of the January 1986 fall.
CAUSE AND EXTENT OF DISABILITY
To recover total permanent disability benefits, the claimant must prove by clear and convincing evidence that he or she is physically unable to engage in any employment, including odd-lot or sheltered employment and employment while working in pain. LRS 23:1221(2)(c). The claimant’s subjective belief that he or she cannot work does not satisfy the statutory burden of proof. Johnson v. Monroe Pulpwood Co., Inc., 505 So.2d 862 (La.App. 2d Cir.1987). A claimant who holds any job after the work injury is not eligible for total permanent disability benefits. See Captain v. Sonnier Timber Co., 503 So.2d 689 (La.App. 3d Cir.1987), and authorities cited therein.
The claimant must prove both the fact of disability and the causal relationship between the disability and the work injury. If the work injury is aggravated by a later injury, whether sustained at or away from work, the occurrence of the later accident will not defeat the compensation claim. If, however, the second accident inflicts separate injuries that do not aggravate the work injury or combine with it to cause the disability, the second accident, and not the first, may be deemed the disabling one. See and compare Hughes v. General Motors Guide Lamp Div., 469 So.2d 369 (La. App. 2d Cir.1985), and Joyner v. Houston Gen. Ins. Co., 368 So.2d 1149 (La.App. 3d Cir.1979).
Ms. Reynolds injured her back, right hip and right knee in the January fall. She injured her left ankle and right elbow in the October fall. Dr. Zum Brunnen characterized the two sets of injuries as separate and unrelated. The trial court accepted Dr. Zum Brunnen’s opinion that the VFW October fall caused Ms. Reynolds to be unemployable as a school bus driver obviously because she acknowledges that she drove the bus from January to October 1986, with no significant increase in her average annual sick leave. She ceased driving the bus only after the VFW accident.
Dr. Zum Brunnen placed certain restrictions on Ms. Reynolds’ activities because of *1045 her back and right leg injuries but these limitations did not preclude her from all types of work.
The trial court discounted Dr. Hucka-bay’s opinion that Ms. Reynolds was unemployable at the time of trial obviously because Dr. Huckabay said he considered her unemployable in 1985, when she was working two “full-time” jobs that required physical exertion and mobility, school bus driver and security guard.
The trial court found that Ms. Reynolds did not meet her burden of proving the cause or extent of her disability or employ-ability in relation to the January accident. The trial court’s findings on the factual issue of causation are not disturbed on appeal unless the reviewing court can articulate why they are clearly wrong, giving deference to the trier of fact’s reasonable evaluations of credibility and reasonable inferences of fact. Crump v. Hartford Acc. & Indem. Co., 367 So.2d 800 (La.1979).
Ms. Reynolds’ credibility was effectively impeached in many respects. The testimony of her treating physicians does not support her contention that she is unable to perform any kind of work. She did not seek, here or below, supplemental earnings or other statutory benefits as an alternative to her demand for total permanent disability benefits. Defendant effectively defended against a potential claim for supplemental earnings benefits with evidence of local job availability, considering her background and medical restrictions, at wages comparable to her wages as a security guard. See § 1221(3) and Batiste v. Hopeman Bros., Inc., 508 So.2d 922 (La. App. 4th Cir.1987), writ denied.
MEDICAL AND TRAVEL EXPENSES
Ms. Reynolds claims about $500 for the cost of drugs prescribed by Dr. Zum Brunnen between April and November 1987; $210 in travel expenses to see him between November 1986 and October 1987; $116.38 in admission cost and mileage for two trips to the Huckabay Hospital emergency room in June and August 1987; $1,037.40 in travel expenses for 130 trips on unspecified dates to Dr. Huckabay’s office; and $24.99 for mileage to see Dr. Joffrion for the independent medical examination in February 1987.
Each of the claimed expenses were incurred after the VFW-October fall. With the exception of the $24.99 claim, the record does not show which of Ms. Reynolds’ injuries are associated with these expenses. The other claimed expenses, totaling over $1,800, are not recoverable because neither Ms. Reynolds nor her doctors related them to the January fall. See and compare Barry v. Western Elec. Co., Inc., 485 So.2d 83, 92 (La.App. 2d Cir.1986), writ denied.
While the $24.99 travel expense to see Dr. Joffrion clearly relates to the January 1986 fall, Ms. Reynolds did not specifically assert this claim until trial or otherwise notify her employer or its insurer of the mileage claim. Defendants pleaded, as an affirmative defense, offset for the difference between the temporary total disability benefits that Ms. Reynolds was paid while she was regularly employed as a school bus driver and the lesser supplemental earnings benefits that may have been owed her under the statute. Under these circumstances, we find no error in the judgment that rejects her demand for the $24.99 travel expense.
PENALTIES AND ATTORNEY FEES
The record supports the trial court’s finding that benefits were justifiably, and not arbitrarily, terminated in March 1987 because the insurer by that time had acquired medical opinions and factual and medical information on which to base its termination of total disability benefits. We agree that under the circumstances of this record, Ms. Reynolds is not entitled to penalties or attorney fees. The record supports the judgment in all respects.
DECREE
At appellant’s cost, the judgment is AFFIRMED.