499 So.2d 402 (1986)
Evans M. BISTES, Jr.
v.
ASPLUNDH TREE EXPERT COMPANY and ABC Insurance Company.
No. CA-3956.
Court of Appeal of Louisiana, Fourth Circuit.
November 14, 1986.
*403 George R. Simno, III, James J. Kokemor, New Orleans, for plaintiff-appellant.
John G. Gomila, Jr., Patricia M. Crowley, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendants-appellees.
Before WARD and ARMSTRONG, JJ., and PRESTON H. HUFFT, J. Pro Tem.
ARMSTRONG, Judge.
This is an appeal from a judgment of the trial court in which Asplundh Tree Expert Company's employee was found partially disabled and was awarded benefits pursuant to the Louisiana Workmen's Compensation Act. LSA-R.S. 23:1021, et seq. (1975) (amended 1983).
Plaintiff Evans M. Bistes, Jr., had been employed as a tree-trimmer by defendant, Asplundh, for approximately eight years. On February 14, 1983, the date of the alleged accident, Bistes was working as a groundman while his foreman, Juan Espinosa, was positioned above in a hydraulic lift bucket cutting away limbs and branches. Plaintiff claims that at approximately 10:00 A.M. a large tree limb fell from about thirty feet above, the butt of which struck him on the head, bounced off of his hardhat and hit him squarely on the right shoulder. Bistes alleges that the accident was witnessed by his foreman, Espinosa, and the general foreman, Donald Donovan, and *404 that both men came to his aid. Donovan released Bistes from work about an hour later and drove him to get his motorcycle. Donovan told Bistes not to return to work without a note from his physician.
Upon his return home, plaintiff tried to relieve his pain by taking a hot shower and by applying ice packs to the injured area. His parents testified that they observed abrasions, a cut and a large bruise on their son's right shoulder. They also noted a small cut under his right eye. Plaintiff's mother took him to their family physician, Dr. Oscar R. Pereda, on February 16, 1983. (February 15, 1983 was the Mardi Gras Holiday). Dr. Pereda, having found tenderness in the cervical area and a decreased range of motion in the right shoulder, prescribed a muscle relaxant and ordered x-rays from Mercy Hospital. The x-rays appeared normal and the plaintiff returned to work on February 22. At that time he presented Donovan with a note from Dr. Pereda which specified that Bistes had been treated for a shoulder injury. Bistes then requested and received permission from Donovan to perform only light ground duties due to the pain in his shoulder.
Plaintiff maintains that Donovan told him that he would be reimbursed for any medical expenses incurred. He claims that he gave Donovan a copy of the x-ray bill from Mercy Hospital when he returned to work on February 22, 1983. This bill was in the amount of $41.00. On February 28, 1983 Bistes was given a pay check for $102.00 and an additional check in the amount of $41.00 for "expenses paid."
Also on February 28, 1983, Bistes was issued a job infraction warning regarding an incident which had occurred the previous month. Donovan and Espinosa accused Bistes of "refusing to pay attention and of causing a production loss" when he allegedly left a small piece of equipment at the dump site on January 25, 1983. The tool was recovered the following work day.
On March 1, 1983, Espinosa ordered Bistes to climb a tree and cut the upper branches without the aid of the hydraulic lift bucket. Bistes refused to do so after pointing out that he could not support his body weight because of his shoulder pain. The plaintiff was then fired for refusing to climb the tree.
Bistes claims that he continued to experience pain and discomfort whenever he attempted any activity involving the use of his right shoulder. On March 28, 1983, Bistes consulted an orthopedic surgeon, Dr. Charles R. Billings, who found that the right shoulder was still tender to palpitation. Dr. Billings also noted mild joint crepitus and a contusion of the right shoulder with probable early degenerative rotator cuff disease, post-traumatic in origin. He recommended an exercise program and the occasional use of nonsteroidal anti-inflammatory drugs. At the request of Asplundh, plaintiff was examined a year later, on March 9, 1984, by Dr. H.R. Soboloff. Dr. Soboloff found evidence of winging of the right scapula and of acromioclavicular joint tenderness when pressure was applied or when the plaintiff was engaged in lifting activities involving his right side. Dr. Soboloff suggested that plaintiff have an EMG (Electromyogram) to check for nerve damage and that plaintiff be placed on an exercise program and steroid injections. He opined that this type of treatment should resolve plaintiff's problem and "allow him to return to gainful employment."
Asplundh has continuously denied workmen's compensation benefits to plaintiff. The trial court rendered judgment finding plaintiff partially disabled and awarded him $146.00 per week in workmen's compensation for the duration of his disability, not to exceed 450 weeks. Louisiana Worker's Compensation Act, LSA-R.S. 23:1221(3), (1975) (amended 1983).
By his first assignment of error appellant contends that the trial court erred in finding that plaintiff's injuries were suffered in a work-related accident rather then in a nonwork-related prior motorcycle accident. We disagree.
Although procedural rules are construed liberally in favor of workmen's *405 compensation claimants, the claimant retains the burden of proving by a preponderance of the evidence that a work-related accident took place. Thus, the testimony as a whole must show that more probably than not an employment accident occurred and that it had a causal relation to the disability. Prim v. City of Shreveport, 297 So.2d 421 (La.1974). The burden of proof, however, shifts to the defendant when he alleges that the plaintiff's injuries are the result of an intervening cause, i.e. the prior motorcycle accident. Lightfoot v. J. Ray McDermott & Co., 417 So.2d 394 (La.App. 4th Cir.1982).
Plaintiff admits that he was in a motorcycle accident that occurred some seven years earlier. His medical records refer to the earlier accident and note injuries to the left kidney and left elbow. Subsequent medical examinations did not reveal any damage to the right shoulder prior to the alleged February 14th accident. Plaintiff testified that he was injured on February 14, 1983. His parents testified that they saw bruises and abrasions on their son's shoulder when he returned from work that day and a black eye the next day. Bistes sought medical help two days after the injury. He returned to work but was fired when he was unable to perform tasks requiring the use of his right shoulder.
Plaintiff testified that the only witnesses to the accident were his foreman and general foreman. Both Espinosa and Donovan denied seeing the accident or being informed of it until they received notice from Bistes's attorney on March 22, 1983. Donovan, however, admits driving Bistes to his motorcycle on February 14, because Bistes "wasn't feeling well," and also admits receiving Dr. Pereda's note on February 22. The foremen likewise deny authorizing reimbursement for Bistes's medical bills, although neither could explain the $41.00 check issued to the plaintiff six days after he allegedly presented Donovan with a $41.00 x-ray bill from Mercy Hospital.
Asplundh argues that the injury was the result of a motorcycle accident which occurred prior to Bistes being assigned to Espinosa's crew. Donovan, Espinosa and a co-worker, Paul Crotwell, all testified that plaintiff had discussed a prior acccident with them but could give no certain details as to when and where the conversation took place, nor could they supply any details regarding the accident itself. Donovan testified that Bistes had been put on light duty prior to February 14th because of Bistes's shoulder pain from the motorcycle accident. Espinosa was unsure as to when Bistes was placed on light duty but thought it was not until after Donovan received Dr. Pereda's note.
Whether a plaintiff suffered a workrelated injury is a question of fact and a credibility determination which will not be disturbed on appeal where the evidence furnishes a reasonable factual basis for the trial court's finding, unless those findings are clearly wrong. Martin v. H.B. Zachry, Co., 424 So.2d 1002 (La.1982); Flood v. Hub Auto Parts, Inc., 425 So.2d 941 (La. App. 4th Cir.1983). When the evidence is viewed as a whole, we cannot say that the trial court was manifestly erroneous in finding that a work-related accident took place. Nor do we find that Asplundh met its burden in proving that plaintiff's injuries were the result of an intervening cause.
Asplundh next avers that the trial court erred in finding plaintiff partially disabled. Asplundh argues that plaintiff has not attempted to engage in his regular or similar work, has not proven the extent of his disability, nor has he shown that he is in substantial pain so as to prevent him from returning to work.
LSA-R.S. 23:1221(3) (1975) (amended 1983) of the Louisiana Workmen's Compensation Act specified that an employee is deemed partially disabled if he is unable "to perform the duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, and experience...." It has been held that even if a worker can perform other jobs which are available, he should be considered partially *406 disabled if he cannot perform without substantial pain the same work that he did before his injury. Dusang v. Henry C. Beck Builders, Inc., 389 So.2d 367 (La. 1980).
A claimant is not considered disabled solely because he suffers some residual pain and discomfort. The pain following a work-related accident must be substantial or appreciable. Dusang v. Henry C. Beck Builders, Inc., Id. Whether the pain suffered by a claimant is substantial enough to be disabling is a question of fact based upon the claimant's credibility in light of the medical testimony. Jacobs v. Pik-Quick, Inc., 454 So.2d 303 (La.App. 4th Cir.1984). The ultimate determination concerning a disability under the worker's compensation statute is by the courts, not the medical experts. Urbina v. Alois J. Binder Bakery, Inc., 423 So.2d 765 (La. App. 4th Cir.1982).
In the instant case, plaintiff was fired for not being able to perform his duties as a tree-trimmer after he returned to work. He claims that since being fired he has been unable to work as a tree-trimmer or perform similar work involving the use of his right shoulder. He likewise claims that simple tasks such as combing his hair or lifting or reaching for an object cause him pain which he describes as similar to that experienced in a shoulder separation injury. His parents corroborated that his attempts to perform household tasks or mow the lawn cause him great discomfort and that he still suffers stiffness in the morning. Each of the treating physicians found tenderness and soreness as well as other objective evidence of posttraumatic injury. Asplundh's own medical expert found such evidence more than a year later. Under these circumstances we cannot find that the trial court was manifestly erroneous in deciding the credibility issue in favor of plaintiff and in finding him partially disabled.
In his final assignment of error appellant objects to the trial court's calculation of benefits awarded to the plaintiff. We find no basis for this objection.
At the time of plaintiff's accident, LSAR.S. 23:1221(3) and (4) categorized compensable injuries as those producing a loss of a specific body part or the function of a specific body part as opposed to more general non-specific impairments producing partial disability.[1] Appellant argues that *407 because the Act does not make mention of a "shoulder" as a specific body part, plaintiff's injury should be considered as either the specific loss of an arm (LSA-R.S. 23:1221(4)(f)), the permanent partial loss of the function of the arm (LSA-R.S. 23:1221(4)(o)), or the permanent loss of the function of the arm (LSA-R.S. 23:1221(4)(p)). Any of the above options would result in a significant decrease in the number of weeks in which plaintiff would qualify for benefits. The trial court, however, found plaintiff partially disabled, applied LSA-R.S. 23:1221(3), and awarded the plaintiff $146.00 per week for the duration of his disability for a term not to exceed 450 weeks.
In support of his argument appellant cites us to Slocum v. Lamartiniere, 369 So.2d 201 (La.App. 3rd Cir.1979) in which the court awarded benefits under LSA-R.S. 23:1221(4)(f, o) for a "shoulder" injury. In Slocum, however, the parties had agreed that the physician's reference to a disability of the "shoulder" or "upper extremity" referred to the primary finding of a fracture of the upper humerus (upper arm bone). Because the compensation act did not include "shoulder" as a body part the court considered plaintiff's disability affecting the upper humerus to be one affecting the arm itself and disregarded the reference to the "shoulder."
Mr. Bistes's injury did not involve the arm or any other body part listed in LSAR.S. 23:1221(4), nor did his injury involve the partial or permanent loss of the physical function of any body part listed in LSAR.S. 23:1221(4).
Appellant further argues that the compensation award was in error since the percentage of disability and the estimated duration of the disability was not established at trial. In Urbina v. Alois J. Binder Bakery, Inc., 423 So.2d 765 (La.App. 4th Cir.1982), this court awarded the maximum number of weeks of benefits under LSAR.S. 23:1221(3) where plaintiff was found partially disabled and unable to perform her regular work duties by virtue of the pain which she experienced when lifting, bending, stooping or sitting for prolonged periods. The court did not require that a percentage of disability be shown in order for plaintiff to qualify for the maximum benefit. Furthermore, where the evidence does not indicate the duration of a disability; *408 the plaintiff is entitled to benefits during his disability not to exceed the maximum period allowed by law. Ramsey v. Dragon, Ltd., 448 So.2d 745 (La.App. 4th Cir.1984).
Finally, appellant contends that the compensation award should be reduced by the wages Mr. Bistes received for the work week ending on February 26, 1983, and by the amount of any wages Mr. Bistes may have earned prior to trial.
Although an employer may be allowed credit for the continued payment of wages which pursuant to an express or implied agreement are paid in lieu of compensation, the jurisprudence is now settled that an employer or insurer is not entitled to a credit against compensation liability, for wages which are fully earned by the disabled employee. Madison v. American Sugar Refinery Co., 243 La. 408, 144 So.2d 377 (La.1962); Occhipinti v. Marquette Casualty Co., 158 So.2d 389 (La.App. 3rd Cir.1963).
Because Mr. Bistes's wages were fully earned by him when he returned to work after the accident, Asplundh is not due a credit. Also, Asplundh is not due a credit for wages Bistes allegedly earned prior to trial since the trial evidence failed to establish that he had ever been gainfully employed since his dismissal by Asplundh.
In conclusion, we are satisfied, based on the medical reports and lay testimony presented at trial, that Mr. Bistes could not perform the same duties in which he was customarily engaged when injured, or duties of the same or similar character for which he was fitted by education, training and experience. The record, however, does not establish whether or not he can pursue some other career which does not involve lifting or strain on the right shoulder. Therefore, we are in agreement with the trial court's award of benefits and its finding that plaintiff was partially disabled within the meaning of LSA-R.S. 23:1221(3). Ramsey v. Dragon Ltd., id. at 750.
For the foregoing reasons the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] LSA-R.S. 23:1221(3) and (4) read in part:

* * * * * *
"(3) For injury producing partial disability of the employee to perform the duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, and experience, sixty-six and two-thirds per centum of the difference between the wages the employee was earning at the time of the injury and any lesser wages which the injured employee actually earns in any week thereafter in any gainful occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training, and experience, during the period of disability.
* * * * * *
... and not beyond a maximum of four hundred fifty weeks for such partial disability resulting from injury occurring on and after September 1, 1977;
* * * * * *
"(4) In the following cases, the compensation shall be as follows:
"(a) For loss of a thumb, sixty-six and twothirds per centum of wages during fifty weeks.
"(b) For the loss of a first finger, commonly called the index finger, sixty-six and two-thirds per centum of wages during thirty weeks.
"(c) For the loss of any other finger, or a big toe, sixty-six and two-thirds per centum of wages during twenty weeks.
"(d) For the loss of any toe, other than a big toe, sixty-six and two-thirds per centum of wages during ten weeks.
"(e) For the loss of a hand, sixty-six and twothirds per centum of wages during one hundred fifty weeks.
"(f) For the loss of an arm, sixty-six and twothirds per centum of wages during two hundred weeks.
"(g) For the loss of a foot, sixty-six and twothirds per centum of wages during one hundred and twenty-five weeks.
"(h) For the loss of a leg, sixty-six and twothirds per centum of wages during one hundred seventy-five weeks.
"(i) For the loss of an eye, sixty-six and twothirds per centum of wages during one hundred weeks.
"(j) For the loss of both hands or both feet, or both eyes, one hand and one foot, shall, in the absence of conclusive proof to the contrary, constitute permanent total disability.
"(k) The loss of the first phalanx of the thumb or big toe, or two phalanges of any finger or toe, shall be considered to be equal to the loss of one-half of such member, and the compensation shall be one-half of the amount above specified.
"(l) The loss of more than one phalanx of a thumb, or more than two phalanges of any finger or toe shall be considered as the loss of the entire member; provided, however, that in no case shall the amount received for more than one finger exceed the amount provided in this schedule for the loss of a hand, or the amount received for the loss of more than one toe exceed the amount provided in this schedule for the loss of a foot.
"(m) Amputation between the elbow and the wrist shall be considered as equivalent to the loss of a hand, and amputation between the knee and the ankle shall be equivalent to the loss of a foot.
"(n) A permanent total loss of the use of a member is equivalent to the amputation of the member.
"(o) In all cases involving a permanent partial loss of the use of function of the members mentioned hereinabove, compensation shall bear such proportion to the amounts named herein for the total loss of such members as the disability to such members bears to the total loss of the member, provided that in no case shall compensation for an injury to a member exceed the compensation payable for the loss of such member.
"(p) In cases not falling within any of the provisions already made, where the employee is seriously permanently disfigured about the face or head, or where the usefulness of a physical function is seriously permanently impaired, the court may allow such compensation as is reasonable and in proportion to the compensation hereinabove specifically provided in the cases of specific disability, not to exceed sixty-six and two-thirds per centum of wages during one hundred weeks."
* * * * * *